BRININSTOOL v. MICHIGAN UNITED RAILWAYS CO.

1. NEGLIGENCE — MASTER AND SERVANT — WILFUL OR MALICIOUS ACTS.

A charge to the jury that the defendant railway company is not liable for the wilful or malicious act of its motorman in unnecessarily blowing the whistle and frightening plaintiff's team, but that it would be liable for a negligent blowing of the whistle, is sufficiently favorable to defendant.

2. SAME—STREET RAILWAYS—UNNECESSARY USE OF WHISTLE.

Testimony that there was no crossing within one and one-half miles, and no apparent necessity for blowing the whistle, raises an issue of fact as to the negligence of the defendant.

3. PERSONAL INJURIES — EXPERT AND OPINION EVIDENCE — DAMAGES.

While impairment of the nervous system and disorders reasonably certain to result from the injuries are proper elements, testimony as to speculative possibilities is not a proper basis upon which to estimate damages.

4. SAME—DAMAGES, FUTURE AND PROSPECTIVE.

To entitle a plaintiff to recover damages for apprehended future consequences of an injury, there must be a degree of probability of such consequences as to amount to a reasonable certainty that they will result from the original injury.

Error to Calhoun; North, J. Submitted February 19, 1909. (Docket No. 107.) Decided June 7, 1909.

Case by Verne S. Brininstool against the Michigan United Railways Company for personal injuries. A judgment for plaintiff is reviewed by defendant on writ of error. Reversed.

*Sanford W. Ladd*, for appellant.

*J. M. & J. L. Powers*, for appellee.

OSTRANDER, J. The plaintiff, driving a team of horses in the highway, adjoining the track of the defendant's

railway, was thrown from the wagon and injured. The team was frightened; the wagon and harness broken. He alleges in his declaration:

"The said defendant, by its agents, servants, and employés, again sounded said whistle, without any reason or cause therefor, a large number of times, for the express purpose of frightening said team, and of injuring said plaintiff; that at the time said whistle was sounded as aforesaid, said car was not approaching any crossing nearer than 1½ miles from the point where said whistle was sounded, and there was no reason whatever for the said defendant, by its said servants, agents, and employés, to sound said whistle; that the said defendant, its agents, servants, and employés then and there well knew, at the time said whistle was sounded as aforesaid, that said plaintiff's team was frightened, and liable to run away on account of the repeated sounding of said whistle, yet the said defendant, by its agents, servants, and employés, disregarding its duty as aforesaid, wilfully, maliciously, wantonly, and negligently continued to sound said whistle after it, the said defendant, its agents, servants, and employés well knew that the plaintiff's said team was being frightened by said whistle and the passing of said car, and did not stop, or attempt to stop, said car or cease to sound said whistle until said team of said plaintiff was so frightened that it was impossible for said plaintiff to control and manage said team."

In the second count of the declaration, a careless and negligent sounding of the whistle, frightening plaintiff's team and causing his injury, is alleged.

The court instructed the jury:

" I am requested to charge you, and do charge you, that the defendant in this case is not liable for any damages whatever to the plaintiff, if you find that the motorman, at the time he blew the whistle in question, was not in any way furthering or serving the defendant's interests, and that he blew the whistle, not for any purpose in connection with the ordinary and proper handling of the car, or because it was his duty in any way, as a motorman, to blow the whistle, but for the intentional purpose of frightening the plaintiff's horses; and, if you find such to be the fact, I charge you that your verdict must be for the defendant, ' No cause of action.' I also charge you that the

defendant railway company is not liable in this case for any damage to the plaintiff whatever, if you find that the motorman upon the car blew the whistle intentionally, wilfully, and maliciously for the purpose of frightening plaintiff's horses, if you further find that what he did in that respect was not within the scope of his employment as a motorman. Those two requests have already been covered in substance. In determining, gentlemen, whether or not there was negligence or carelessness on the part of the motorman in sounding the whistle in the manner and at the place that he did, I say to you, if you come to the other question (and you will have to consider it) of determining whether or not he was wilful or malicious in sounding the whistle in the manner and at the time and place he did, you have a right to take in consideration, and should take in consideration, the fact that the whistle, as is indicated by some of the evidence in the case (and that is a question of fact for you to determine), was not blown ordinarily at this point, and that there was no crossing within a mile and a half, and under the light of the other surrounding circumstances as shown by the evidence in the case which would enable you to determine the principal phase of the first question you have to decide upon, viz., whether or not there was carelessness or negligence on the part of the motorman in sounding the whistle, or whether he was prompted by wilfulness and maliciousness."

1. It is one of the contentions of the defendant, appellant, that a verdict for defendant should have been directed, for the reason that the testimony for the plaintiff tended to prove a malicious and wilful, as opposed to a negligent and careless, use of the whistle; that it did not tend to prove a negligent and careless use of the whistle. It is true that the testimony for the plaintiff (no testimony upon this subject was offered by defendant) tended to prove there was no apparent necessity for such sounding of the whistle as was alleged and proven, and witnesses were permitted to testify, on cross-examination, that they thought the motorman sounded the whistle to make the horses jump. It cannot be said, however, as matter of law, that the testimony did not tend to prove a negligent use of the whistle, as opposed to a malicious and a wanton

use of it.   It was not error to submit the case to the jury upon the theory of defendant's responsibility for the careless and negligent use of the whistle; and, as the instructions upon the subject of wilful and malicious use were agreeable with defendant's contention, it must be assumed that the jury found the negligence of the motorman, and not his wilfulness, was responsible for the fright of the team.   It is therefore unnecessary to enter upon the subject of the responsibility of the defendant for the wilful or the malicious conduct of the motorman.

2.  Defendant produced as a witness the physician who attended the plaintiff at the hospital to which he was taken August 17th, and from which he was discharged August 26th.   He was of opinion that plaintiff sustained no permanent injuries.   Plaintiff's testimony tended to prove that he had been—was when injured—a healthy man.   He was rendered unconscious by being thrown from his wagon; his nose was broken; his scalp badly cut, front and rear.   There was also testimony that the skull was fractured.   Since the injury—never before—he has been subject to headache, bleeding at the nose, and at intervals to "nervous spells," which prevented work and reading.   His witness, Dr. Alvord, gave testimony tending to prove a continuing and permanent injury to plaintiff.   It was objected that no injury to the brain, and none to the nervous system, was alleged, and also that testimony, wholly uncertain and speculative in character, was admitted to prove the nature and probable consequences of the injury.   The objection last stated is the one relied upon in this court.   After describing the external evidences of injury to the head, and the manner in which force applied to the skull sufficient to produce such injuries would affect the blood vessels and soft matter of the brain, the witness said, among other things:

"Now, in this case we didn't have a rupture of the brain, but we have a large amount of pressure upon those capillaries, which has induced a great deal of congestion here that didn't properly belong there.   I mean to say,

those capillaries, instead of being the small capillaries, that they were created elastic, as they are, and they are as elastic as rubber, have been pressed with the amount of blood in them until they are forced to contain a great deal more blood than they have any business to in the same space, so that those are enlarged, permanently enlarged, because the blood keeps forced in from the heart below. What is the result? The result is not only this depression here, but possibly extending to the inner table of the skull, as well as without, but the result is what we have got always to have in mind, recurring probabilities of brain trouble, a type which always follows these traumatic troubles. * * * For instance, it is quite a common thing for these traumatic injuries to the brain, of this type—accidental, forceful injuries—to develop epileptic fits within two or three years afterwards. It is quite a common thing for them to develop sclerosis, a hardening of the cells themselves, in operations that produce the shaking palsy. * * * He cannot live a minute longer without that danger hanging over him, and we cannot tell when it will strike him from this time forth, and it is liable to come any month, any year. As years go on he is more liable to it, instead of having the healthful changes that occur in advanced years for the man with a good healthy brain, who has no such changed conditions in the blood supply there—that he is very likely—and a good deal more likely than a normal man to (not) have brain trouble or neurosis that produce insanity, epilepsy, paralysis, and all that class of cases. A good deal more might be said but this is the drift of it; that is the most important part of this case. * * * They are permanent—I don't mean to say that the scalp wound is a permanent injury. All these external conditions have healed as much as they will ever heal. I am not, I trust, very much mistaken. * * *

"*Q.* During the examination which you have made of Mr. Brininstool last evening and had before the injury have you discovered any nervous condition?

"*A.* Yes, sir. * * * In assuming that he had never had nervous spells prior to the injury received, but since the injury he had been frequently subject to these nervous spells, of being nervous, I would say that they were very likely produced by the injury, or rather indirectly by the injury, simply as symptoms of deep-seated trouble within the brain.

"*Q.* Then a nervous condition occurring in that way, I understand you, would be a symptom of an injury or some trouble to the brain?

"*A.* A symptom of brain lesion, internal injury, perhaps would be the English of it. \* \* \* There are two forms of nervous difficulties; they are organic and functional. Now, ordinary functional headache that comes on, the functional nervous difficulties that we have every once in a while in normal people, is very different in its character, in its history, and in its type, from a nervous condition, which we get in cases of brain lesion. In the functional type of nervous troubles they are largely hysterical. They don't amount to any particular sum. In case of injury by traumatics, like this, the nervous condition has a very different aspect. It appears different; all the conditions of the body are different; the pulse is different. If the temperature was taken that would be shown to be different, depending upon the hidden cause back of it all in connection with the nervous system within the brain. Mr. Brininstool's nervous condition is organic, rather than functional. It is a permanent condition.

On cross-examination:

"*Q.* Now, doctor, you have stated here as to what might happen in the future in reference to some possible brain trouble, or possible epilepsy, or something of that kind—you don't want to have this jury to understand that this young man is going to have any such trouble as that, or that he is absolutely sure to have some trouble like that, do you, doctor?

"*A.* I would like to have them understand that he has the danger hanging over him for the balance of his life.

"*Q.* A possible danger only?

"*A.* Oh, it is a danger—a living, actual danger.

"*Q.* But it is not anything that you as a physician or as a surgeon would say is going to happen absolutely, is it doctor?

"*A.* I would say—

"*Q.* Answer that by 'Yes' or 'No,' please.

"*A.* Ask.

"*Q.* (Question read.)

"*A.* No, sir; it is true that epilepsy may or may not occur.

"*Q.* And the chances are just as good that it will not, or better, than that it will happen, aren't they?

"*A.* Pretty well divided.

"*Q.* That is your opinion about it? Of course, in your profession you have no absolute certain rules to go by in those matters—that is your opinion only, is that right?

"*A.* It is a matter of opinion.

"*Q.* Now, the other things that you referred to in the way of possible troubles in the future are also along the same line—they may or may not happen, being a matter that the future alone can tell about, isn't that right?

"*A.* That is true.

"*Q.* You have seen many cases where there have been depressions in the skull such as this young man has got, or some depressions, and cases where some other external appearance the same as those where the skull showed the same appearance where no such thing as brain trouble or epilepsy or any of those things have occurred, haven't you?

"*A.* I think not. I think there is always a train of conditions following and depending on such traumatism. It may not be always in one direction; it may not always be epilepsy. It is not true that every injury to the head causes brain trouble.

"*Q.* And it is not true that every injury to the head, even though it has been a violent injury, as perhaps the indications he would show, would cause brain trouble. You don't say that is true in every case?

"*A.* Well, when we have got as much behind it as there is in this case, there is sure to be some brain trouble. A great many people are suffering from brain trouble and don't know it.

"*Q.* And people that are not in a very serious condition go about and do their work; still they are suffering from some little brain trouble or condition. That statement is true, isn't it?

"*A.* Yes, sir; headaches are a very common thing. You oftentimes find very serious headaches in cases where there has been no history of any violence to the head. That is also true of nose bleed. These things, taken in themselves, do not indicate any permanent development here. Only when you collect all these things together they have a significance. The mark on the forehead where the scar is that in itself does not indicate that there is any severe injury. That is not serious as far as a skin trouble is concerned. It is not a trouble that would arise from depression in the rear of the skull; it is

the trouble that would arise from an injury to the brain. The scar on the back of the neck is not a very deep-seated, serious thing, or of anything serious."

On redirect:

"*Q.* Doctor, from your examination of the plaintiff in this case, what would you say as to the probability of his having epilepsy, apoplexy, or paralysis some time in the future?  *  *  *

· "*A.* I cannot say that any more of these will occur. I cannot say what certain sequel there will be in this case, but such a kind of injury as this young man has received never goes through life without leaving its mark on some one of the neuroses, either apoplexy, epilepsy, paralysis, functional or organic nervous difficulties; possibly a formation of a tumor within the brain; possibly a degeneration of the cell tissue, starting in the region where the injury was received; posteriorly, and possibly anteriorly. There is a whole lot of those neuroses, any one of which is liable to occur to this young man during the course of his life. It may not be this year; it may not be next year; it may not be in five years—but he will not get through life without knowing it."

On recross:

"*Q.* Then, of course, I understand you that the injury, if any, and its results, is a matter you can't tell us with any greater degree of certainty than you have already?

"*A.* Correct.

"*Q.* These matters are matters that may or may not happen in the way of difficulties in the future?

"*A.* Any one of them. That is true; as a whole—as a class—some of them will.

"*Q.* And you think that is absolutely correct that some of them will?

"*A.* Yes, sir; I think some of these neuroses will fill out this man's life without question, simply because all these classes of cases have that history.

"*Q.* But you can't tell us which one?

"*A.* No.

"*Q.* Or when?

"*A.* No."

Reading this testimony, it seems to us to amount, in effect, to this: No one could predict which, if any, of the several enumerated disorders would supervene; but a

condition had been created, an effect produced, by the injury permanently impairing the normal health of the plaintiff, manifesting itself in present nervousness, and likely to manifest itself in more serious nervous disorder, at some time during the probable life of the plaintiff. While this is the conclusion we draw from the testimony, we are constrained to say that, as it was elicited, it is more than probable that the jury did not so translate it. It is the generally accepted rule that to entitle a plaintiff to recover damages presently for apprehended future consequences of an injury, there must be such a degree of probability of such consequences as to amount to reasonable certainty that they will result from the original injury. *Strohm* v. *Railroad Co.*, 96 N. Y. 305; *Briggs* v. *Railroad Co.*, 177 N. Y. 59 (69 N. E. 223, 101 Am. St. Rep. 718); 12 Am. & Eng. Enc. Law (2d Ed.), p. 450. See *Collins* v. *City of Janesville*, 99 Wis. 464 (75 N. W. 88). If one of the consequences of an injury is a permanent impairment of the nervous system, it should be considered by the jury in estimating damages. If a more serious nervous disorder than is presently shown is a reasonably certain future consequence of the injury, and is expected, evidence upon the subject should be received. The charge to the jury did not limit or modify the effect of the testimony, or confine the jury to the question of the probable results of the injury to the head. The testimony was all of it permitted to stand for consideration, and as it is obvious that some of it is speculative, and refers to possible consequences and to disorders liable to occur; and as a substantial verdict was returned by the jury, we feel obliged to reverse the judgment, and to order a new trial.

Other contentions which are made are not likely to arise upon a new trial.

Judgment reversed, and a new trial granted.

MONTGOMERY, HOOKER, MCALVAY, and BROOKE, JJ., concurred.