KETHLEDGE v. CITY OF PETOSKEY.

1. DAMAGES — NEGLIGENCE — PERSONAL INJURY — PERMANENT IN-
JURY—EVIDENCE—MUNICIPAL CORPORATIONS.
The trial court, in a personal injury case, erred in sub-
mitting to the jury the question of the permanency of
plaintiff's injuries where there was no testimony in the
case that tended to establish a probability amounting to
reasonable certainty that they would be permanent. Giv-
ing instructions upon an element of damages which is un-
supported by evidence is misleading and erroneous.

2. SAME—EVIDENCE—NEGLIGENCE.
The degree of proof which will entitle a plaintiff to re-
cover for future loss and pain must be such that there
is a reasonable certainty of future damage from the orig-
inal injury.

3. SAME.
Held, that plaintiff's evidence tending to show decreased
earning capacity was meager.

4. SAME—EDUCATION.
It was erroneous to permit plaintiff to recover for pre-
venting her completing her education, upon her testi-
mony that one year after her injury she was able to re-
turn to school and had been for some time working in a
telephone office; the evidence showing, at most, delay.

5. SAME — CURING ERROR — APPEAL AND ERROR — PERMANENCE OF
INJURIES.
The fact that plaintiff recovered only a small verdict, and

that defendant did not claim that the damages were excessive, did not cure the erroneous instructions on the question of damages.

Error to Emmet; Shepherd, J. Submitted January 20, 1914. (Docket No. 27.) Decided March 26, 1914.

Case by Marie L. Kethledge, by her next friend, against the city of Petoskey for personal injuries. Judgment for plaintiff, and defendant brings error. Reversed.

*B. H. Halstead (B. T. Halstead,* of counsel), for appellant.

*Maxwell W. Benjamin,* for appellee.

STONE, J. This is an action on the case to recover damages for personal injuries claimed by plaintiff to have been sustained by her through the falling of a portion of a cement sidewalk upon which she was traveling in the city of Petoskey. Bay View street, or road, runs northeasterly from the Arlington Hotel to Bay View, a distance of about one mile. On the westerly side of the street was a six-foot cement sidewalk which was constructed some 10 or 12 years ago. On May 23, 1912, plaintiff, then 17 years old and residing at Bay View, while on her way to school in Petoskey, about 8 a. m., with two girl companions, claims to have been injured by reason of the falling of a portion of this sidewalk where it crossed a sort of culvert, near the Arlington Hotel. The immediate cause of the falling of the walk was that the earth underneath had become entirely washed out, so that two or three of the five-foot slabs were left wholly unsupported, and when plaintiff and her companions reached this point the walk fell with them, and they were dropped a distance of four or five feet. There had been a heavy fall of rain that morning, and upon the trial of the case there was considerable conflict

in the evidence as to the extent of the storm, its effect, if any, upon the foundation of the walk, the length of time during which the support of the walk had been washed out, the condition of the walk for a year previous, the care or want of care of the plaintiff in not observing the condition of the walk before she walked upon it at the place of the fall, and the proximate cause of the injury; but, as we view the record, these were all questions of fact for the consideration of the jury, and were properly submitted to them. The extent of the plaintiff's injury, and whether she received permanent injuries or not, are, in our opinion, the more important questions in the case. The case was tried on May 7, 1913, about one year after the injury.

Upon the main facts the plaintiff testified as follows:

"I fell on my face into the water. The water was deep enough that I heard the roaring of it and held my head up to keep it out of the water. My garments were all wet when I was taken out. I could not move; I was pinned down by a piece of cement. I think two slabs of cement fell. My left arm and shoulder were pinned down. I called to Mabel (Mabel Shannon, a companion) to help me, but she couldn't, and Mr. Sala helped me out, and Dr. George Reycraft assisted in getting me up on the ground. I certainly was hurt. At the time I couldn't exactly tell where I was hurt. I thought my left arm was broken, but it was not. Dr. Reycraft said it was badly twisted and the ligaments torn. I was also hurt in my side, and my spine, left side. My left hand, also. The doctor gave me quieting medicine, because I was so nervous that I was nearly beside myself. I suffered much pain while I was there from my nervous system, my arm also pained me greatly, and I could not sit up because I was so weak. As soon as I got home that day I noticed the pain in my back, and afterwards. I did not go to school the next day, have not gone to school since. Did not leave my home next day. Was not able to sit up for two weeks, and it was a matter of six or

seven weeks before I was able to be up and around and out of the house at all. I was weak and my arm pained me greatly all this time. I was prevented from leaving the house by the fact that I was weak and not able to walk around. My nerves were affected, ever so much. I feel the pain in my back yet, at the base of the spine. My left arm also pains me greatly yet. It throws itself out of joint. It has done so very recently. If I twist it a certain way—often putting on a glove will sometimes throw it out, while sometimes it will be perhaps several hours that it will not come out of joint at all. I mean directly at the elbow it comes out of joint. I cannot tell when it is going to come out of joint until it does. Then I have to stretch it around a certain way until it slips back into place, or I couldn't stand the pain. That arm isn't as strong as the other. I have pain in it, not continuously, but more or less, all the time. It inconveniences me. It is weak to handle anything. I cannot do the work with it that I could before it was hurt. I have a great deal of pain in my back at present. It has been so since the accident. I never had pain in my back before it, nor trouble with my left arm slipping out of the socket. The pain in my back is not every day, but at times, often, every week, sometimes more than once a week, sometimes maybe not once a week. It does not seem to be caused by anything I do; it just pains at the base of the spine. It is a sharp pain, lasts different times, it pains for some minutes, then it will pain again, sort of recurrent, not continuous. When I fell something struck me on the left side, in the ribs, and it was sore and black and blue. I suffered considerable pain from that. My monthly functions have been affected, causing pain, a great deal, which lasts several hours. Never had the pain before I was hurt. Pain comes every month since I was hurt. I have never slept as well as I did before the accident. As soon as I drop asleep I jump and it awakens me. It is the nerves, I expect, that cause that. I never was nervous before I was hurt. I always slept well before I was hurt. I was in the tenth and eleventh grades when I was hurt. Would have had the twelfth and part of the eleventh grade to finish before graduating. I never returned to school after the accident, because I was not able to

take the examinations; at the time examinations were being held I was just getting so that I could walk around and be around the house. The next fall I didn't feel able to return and start in the new term— I was nervous most all the time. I am able to now. I am working at the telephone office, clerical work. I am earning $5 per week there. With the condition of my nervous system, my arm, and my spine, I do not think that I could do any kind of work that would require physical effort. I used to help my mother with the housework, do some now, but am not able to do so without inconvenience to myself. I am not able to help in the laundry, and work like that; cannot sweep much, on account of my arm. I did scrubbing before I was hurt, but have not done any since, am not able to."

Dr. Reycraft, the only physician who was sworn in the case, testified that he saw the plaintiff a few minutes after she fell through the walk; that she complained of pain in the left arm and in her back; he took her home and examined her there; that she had a slight abrasion of the skin near the elbow joint, and she complained a great deal of pain in the joint; that he examined the arm for a fracture, but did not find any; that he also examined her back, just on the shoulder where there was just a redness; that the skin had been excoriated slightly; that she complained of pain in her left side, just the shoulder and shoulder blade.

"*Q.* Now, coming down to that elbow, did you notice or find that the ligaments had been torn; that the elbow was loose from the socket?

"*A.* Why it is hard to examine, to tell exactly when the ligaments—unless they are frightfully torn—but in an examination where an elbow is that way we would expect more or less trouble with the ligaments. If Miss Kethledge's elbow comes out of the socket, becomes misplaced, it would indicate that the ligaments were not holding the head of the radius correctly. It would show that the ligaments might have been stretched. If a person had never had that hap-

pen to him before the 23d day of May, 1912, and then had this accident which plaintiff had, by falling through this sidewalk, a distance of between 4 and 5 feet, and being struck on the arm by a large piece of the cement walk, or large piece of sod, and injured it to the extent that she did, if the injury was severe enough it might cause the ligament to be stretched.

"*Q.* If the person never had or was troubled with the arm coming out of the socket, and after that injury it did come out of the socket, and here a year afterwards it still continues coming out of the socket, wouldn't that be evidence that the ligaments had been stretched at that time? Wouldn't you give it as your opinion that the injury is what caused the stretching of the ligaments?

"*A.* If the trouble, the bone coming out of place, never had taken place before the time, and continued after that time, you might infer that the injury might have had something to do with it.

"*Q.* What would you say about an injury of that kind to the ligaments which would at this time, nearly a year after the injury, permit the arm to come out of its socket or place, being one that would be curable?

"*A.* That is a hard question to answer.

"*Q.* It is a hard thing to cure, isn't it?

"*A.* Yes, sir.

"*Q.* In fact, it is almost, so far as medical science knows, it cannot be absolutely cured?

"*Defendant's Counsel:* Is that a question or a statement?

"*Plaintiff's Counsel:* It is a statement.

"*A.* That would depend again upon the amount of injury. We cannot always say. I have examined her arm again lately, slightly.

"*Q.* What did you find there in regard to these ligaments?

"*A.* Just at this examination, I was not able to cause the same effect as she had stated that happens. I treated her for about three weeks after she was injured. I treated her for the injury to the elbow joint, and I gave her liniments for the injury to the back and side. I bandaged the elbow and applied liniment, and gave her something to quiet her. She was in pain and nervous. I have treated her since that time, gave her some medicine for painful menstruation. I had

been their family physician before that time. I do not think that she had ever complained of that before the injury. I do not remember how soon it was after the accident that she complained of this. * * * Sometimes a perfectly healthy, normal girl will have pain during that period. Miss Kethledge's condition might have been caused by a fall of four or five feet down a hole. It might have been caused by a'·piece of cement falling and striking her on the side. That could cause it.

"*Q.* Would you say that such a condition is curable?

"*A.* It depends upon the condition present. I treated her for pain in the back at the time she was hurt, and recently she had pain in the back from menstruation. There is connection between the pain in the back and the menstruation. A great many times they go together. Miss Kethledge is a person of medium nervous temperament."

Upon cross-examination the witness testified that he visited the plaintiff at her home nine times in the three weeks after the injury; that he did not treat her for any internal injuries, and didn't find any injuries to treat her for, only the soreness that she complained of; that the radius is one of the bones in the forearm, and works in a ball and socket joint; that the ball is held in the socket by ligaments which extend from one bone to the other; that in order for the ball to be removed from the socket the ligaments must be weak from some cause.

"*Q.* Now, I understood you to say that you endeavored to produce the condition at that joint that Miss Kethledge claimed existed there, and that you were unable to do so. Is that right?

"*A.* Well, I didn't—she complained of that condition there—as I said, I examined it slightly. She said certain ways she would move her arms, it would seem to bother her.

"*Q.* At the recent examination, last Saturday?

"*A.* I haven't made a thorough examination lately —a slight examination.

"*Q.* At that time you were unable to produce—

"*A.* I didn't go at it in a way to try to shove it one way and another, but just felt of her arm. I didn't feel anything go out of place at that time.

"*Q.* From that examination could you ascertain, or did you ascertain, whether the ligaments were weak or stretched—at this last examination?

"*A.* No, I gave her a very slight examination.

"*Q.* Did you ever see her arm when it was dislocated in this manner?

"*A.* It was not dislocated when I saw it. I never saw it dislocated at any time. She never called me at the time."

Upon redirect examination the witness testified that the fall which the plaintiff had, and being pinned down there, with the water rushing over her, would naturally result in a shock to the nervous system to some extent, and that she was very nervous when he saw her; that generally that was a thing that could be cured; generally the nerves right up, to a certain extent; that sometimes they get back to where they were before that shock took place, not always, and whether they would in her case he could not tell.

The mother of the plaintiff testified that she had observed plaintiff when she had trouble with her arm coming out of the socket, she could not say how many times, but a good many times, it often twisted; that in putting on her gloves, or putting up her hair, or lifting, sometimes, it would come out. The following occurred:

"*Q.* In the condition that Marie is now—the arm in the shape it is and her nervousness—do you consider that her earning powers have been decreased? (Objected to. Overruled. Exception taken.)

"*A.* I do.

"*Q.* And if she continued in the future to be in the same physical condition as she is at present, how much would you say her earning powers have been decreased per week? (Objection and exception.)

"*A.* Well, quite a good deal. * * *

"*Q.* If her present condition should exist during

her life, how much per week would her earning power be decreased?

"*A.* Well, she wouldn't be worth very much for housework now.    *    *    *.

"*Q.* Can you give an estimate of how much she is worth now to do housework?

"*A.* Perhaps a dollar and a half a week.

"*Q.* How much would she be able to earn if she was all right and healthy and in the same condition as before the accident at housework?

"*A.* She would be able to earn probably $5 or $6 a week."

The case was submitted to the jury by a very lengthy charge, and the trial resulted in a verdict and judgment for the plaintiff of $1,000.

After the denial of a motion for a new trial, which denial was duly excepted to, the defendant sued out a writ of error, and the case is here for review. Under appropriate assignments of error, the defendant discusses the following subjects:

(1) Error of the trial court in instructing the jury that they might award plaintiff damages for permanent injuries, and permanently decreased earning capacity.

(2) Error in instructing the jury that plaintiff could recover for all damages which it was reasonably probable she would sustain in the future, for the permanent annoyance which was liable to be caused and resulting from her injuries, and for her probable loss of future earnings.

(3) Error in instructing the jury that they might find that the plaintiff's earning powers had been decreased, and award damages therefor.

(4) Error in instructing the jury that plaintiff might recover damages on account of being prevented from completing her high school course, and in not prescribing a rule for the measurement of such damages.

The trial court instructed the jury, among other things, that they might use the mortality tables—

"In arriving at the probable length of life of the

plaintiff. This is for the purpose of showing the length of her future suffering, and is to aid you in arriving at a determination of how long she will suffer in the future, provided you find that she is permanently injured."

Also:

"The elements of damage which the jury are entitled to take into account consist of all the effects of the injuries complained of, consisting of personal inconvenience, sickness which the plaintiff endured, all bodily and mental suffering, the permanent annoyance which is liable to be caused, and resulting from the injuries."

Also:

"It is claimed by the plaintiff that, on account of the injury she received, her earning capacity has been decreased, and will be decreased during the rest of her life. If you find that, as a result of the accident, her capacity to earn money in the future has been lessened, and that such capacity has been permanently lessened, then, in addition to the elements of damage which I have heretofore given you, the plaintiff is also entitled to receive, and you will take into consideration, the amount she has lost yearly, if any, by reason of her injuries, and you will consider the time she would probably have lived, and the effect that advancing years would have upon her ability for earning money for years that she would probably have lived after arriving at the age of 21 years, and she would be entitled to that as the item for loss of earnings."

Also:

"In order to determine the present worth or value of such annual loss of earnings which she has sustained, if any, you will compute the present worth or value of her probable loss of earnings for one year, for two years, for three years, from the time she will become 21, and so on up to and including the whole term of years that you may find that she will probably live. * * * The term should, in no event, exceed the expectancy of life stated by me, namely, 41½ years."

We have at the expense of prolixity set forth above the substance of the testimony relating to the extent and nature of the plaintiff's injuries.

1. We are of opinion that the above instructions were erroneous, for the reason that there was no evidence in the case from which the jury should have been permitted to find that the plaintiff was permanently injured, or that her earning capacity would be permanently decreased. In *Deneen* v. *Railway Co.*, 150 Mich. 235 (113 N. W. 1126, 13 Am. & Eng. Ann. Cas. 134), the trial judge instructed the jury that they might award damages for permanent injuries if they should find that such injuries had been sustained. This court held that there was no testimony in the case that indicated a probability that the injury would be permanent, that at most there was only a possibility that the plaintiff might never entirely recover. It was said:

"To leave the jury the opportunity of finding that the injury was permanent and basing damages thereon was harmful."

The rule that the giving of an instruction upon the element of damages which is unsupported by evidence is misleading and erroneous is universally accepted, and has been frequently applied by this court. *Cousins* v. *Railway Co.*, 96 Mich. 386 (56 N. W. 14) ; *Williams* v. *Village of Petoskey*, 108 Mich. 260 (66 N. W. 55) ; *Buxton* v. *Ainsworth*, 138 Mich. 532 (101 N. W. 817, 5 Am. & Eng. Ann. Cas. 146).

2. Upon plaintiff's request, the court instructed the jury that plaintiff was entitled to recover for "all damages which it is reasonably probable she will sustain in the future," and similar expressions were used in other parts of the charge. In *Brininstool* v. *Railways Co.*, 157 Mich. 172, at page 180 (121 N. W. 728), Justice OSTRANDER said:

"It is the generally accepted rule that to entitle a

plaintiff to recover damages presently for apprehended future consequences of an injury, there must be such a degree of probability of such consequences as to amount to reasonable certainty that they will result from the original injury"—citing many cases.

In 13 Cyc., at page 139, the general rule is stated as follows:

"Only such future damages can be recovered as the evidence makes reasonably certain will necessarily result from the injury sustained"—citing many cases.

*Marshall* v. *Railroad Co.,* 171 Mich. 180-184 (137 N. W. 89); *Block* v. *Railway Co.,* 89 Wis. 371 (61 N. W. 1101, 27 L. R. A. 365, 46 Am. St. Rep. 849). In the last-cited case the court said:

"The criticism is on the phrase 'reasonable probability.' Because the phrase is equivocal, it is liable to communicate to the jury an erroneous impression that some degree of proof less than of reasonable certainty may be sufficient. It is settled in this court that the degree of proof must amount to reasonable certainty."

*Groundwater* v. *Town of Washington,* 92 Wis. 56 (65 N. W. 871); *Raymond* v. *Keseberg,* 91 Wis. 191 (64 N. W. 861); *Smith* v. *Traders' Exchange,* 91 Wis. 360 (64 N. W. 1041, 30 L. R. A. 504, 51 Am. St. Rep. 912).

3. Upon the third point urged, it may be said that the evidence was meager of future decreased earning powers.

4. Prevention of completion of education.

We find no evidence to justify the submission of this question. At most, the completion of plaintiff's education had been delayed only, by the injury, for she testified that she was then (one year after the injury) able to return to school and her school course, and then was, and since the fall of 1912 had been, doing clerical work in a telephone office.

Plaintiff's counsel urges that, even if the case was erroneously submitted upon the question of perma-

nent injuries, still the verdict was so small that it was fully warranted to compensate for past injuries, and that defendant, not claiming that the damages were excessive, should not complain, especially as defendant's counsel did not object to the introduction of the table of mortality.  A similar question was before us in *Richardson* v. *Railway Co.,* 176 Mich. 413 (142 N. W. 832), where we said:

"While there is no complaint urged here that the judgment is excessive, yet it is properly urged and claimed in the motion for a new trial, and covered by proper assignments of error, that the whole basis of the measure of damages was erroneously given to the jury; and we cannot say that the error has not affected the judgment; nor are we able to state the amount the judgment has been enhanced by this erroneous part of the charge."

In a recent case where the circuit judge attempted to cure the effect of an erroneous instruction by reducing the judgment, this court reversed the judgment for the reduced sum, saying:

"It is possible the jury might have returned this amount if they had been properly instructed as to the law, but we are unable to say this is so." *Jaskolski* v. *Morawski,* 178 Mich. 335 (144 N. W. 865).

Other objections urged are not likely to arise upon a new trial.  For the errors pointed out, the judgment of the circuit court is reversed, and a new trial granted.

BROOKE, OSTRANDER, MOORE, and STEERE, JJ., concurred with STONE, J.

KUHN, J.  I concur in reversing the case on the second ground given.

MCALVAY, C. J., and BIRD, J., concurred with KUHN, J.