Joseph E. SLEEMAN, Plaintiff,

v.

CHESAPEAKE & OHIO RAILROAD COMPANY, a Virginia corporation, Defendant and Third-Party Plaintiff,

v.

L. A. BARNABY (first name unknown) and Howard Parker, Third-Party Defendants.

Civ. A. No. 5086.

United States District Court
W. D. Michigan, S. D.

Sept. 20, 1968.

See also D.C., 263 F.Supp. 117; D.C., 290 F.Supp. 830.

Rhoades, McKee & Boer, Grand Rapids, Mich., F. William McKee, Grand Rapids, Mich., of counsel, for plaintiff.

Paul O. Strawhecker, Grand Rapids, Mich., Robert A. Straub, Detroit, Mich., for defendant.

Cholette, Perkins & Buchanan, Grand Rapids, Mich., Grant J. Gruel, Grand Rapids, Mich., of counsel, for third-party defendants.

## OPINION

FOX, District Judge.

This is a personal injury action in which plaintiff, Joseph Edgar Sleeman, seeks to recover damages under the Federal Employers' Liability Act, Title 45 U.S.C. § 51 et seq., from defendant, Chesapeake & Ohio Railroad Company.

Plaintiff was born September 7, 1904, and has been employed by defendant Chesapeake & Ohio Railroad Company and its predecessor, Pere Marquette Railway Company, since September 2, 1923. He has been in defendant's coach department all of his service and on the date of the accident, March 26, 1963, he was assistant coach foreman working on the third shift from 11:00 P.M. to 7:00 A.M.

His work consisted mainly of supervising the maintenance, cleaning and repair of passenger cars at the "Wyoming Yards" in Kent County, Michigan, which are used for dispatching, loading, repairing and operating trains engaged in interstate and intrastate commerce.

The "Wyoming Yards" consist of railroad tracks running in a northeasterly and southwesterly direction; a passenger depot immediately northwest of the tracks; and a large parking lot on the north, east and west sides of the depot. A circular cement drive with a small garden and flagpole in its center is located in front of the depot. The drive is used by both train passengers and railroad employees.

There is a loading dock at the southwest end of the depot which is used by mail trucks, freight trucks and other types of vehicles engaged in delivering articles for rail shipment.

The parking facilities and general area around the depot are lighted during the night and early morning hours from various poles, towers and buildings. Since the lighting is almost totally oriented toward the tracks adjacent to the depot and not toward the parking areas, the amount of illumination is uneven and not well distributed over the lot.

There are floodlights on a tower 125 feet south of the first parking bay; floodlights on a 100-foot tower 125 feet east of the first parking bay; a light on a pole at the northwest corner of the depot; and a floodlight on the diesel building at the north edge of the parking lot.

The parking facilities and areas adjacent to the Wyoming Yards depot are utilized for widely divergent purposes. These areas serve both passengers and railroad employees, freight trucks, service vehicles, and various types of tractors. There are no physical barriers separating the parking areas from the areas used by pickup and delivery trucks. Parking lot aisles are not restricted to vehicles destined for parking stalls. There are no separate service roads. There are no restrictions or designated travel paths for pedestrians, or signs or pavement markings warning drivers to watch for pedestrians.

On March 26, 1963, at approximately 5:50 A.M., plaintiff, while in the course of his employment for defendant at the Wyoming Yards, was struck by a loaded truck weighing approximately 9,000 pounds, driven by Howard Parker and owned by L. A. Barnaby.

Evidence established that shortly before the accident plaintiff was in a passenger coach which was hooked up for steam on Track Number 1 south of the east side of the depot.

Just before the accident plaintiff had completed his work in the coach and had decided to return to his office to write his report before the end of his shift

at 7:00 A.M. After leaving the coach he proceeded in a northeasterly direction across the parking lot to his car, which he intended to use to drive to his office because it was raining. As he walked across the parking lot, he observed Parker's truck with its lights on leaving a loading dock and moving in the direction of the garden in front of the depot. Because of the distance between him and the truck, he assumed that the truck would pass behind him. At a point approximately eight feet from his car he was struck by the truck driven by Parker, and dragged and scraped along the pavement an estimated nine feet, with the truck finally coming to rest on his legs.

After bringing his truck to a stop, Parker jumped out of it, checked plaintiff, and found that his legs were pinned under the truck. Parker asked plaintiff if he wanted him to back off or move forward, and they decided Parker should back off his legs.

It was a dark, damp night. The rain was described by Parker as being less than a downpour and more than a drizzle. Parker told plaintiff and others at the scene of the accident that he did not see Sleeman before the accident.

After the accident, plaintiff was immediately hospitalized in Butterworth Hospital in Grand Rapids, and was discharged from the hospital on May 13, 1963. He was certified back to work as assistant coach foreman July 1, 1963, and resumed work the first week of July 1963.

From the time plaintiff went back to work at his old job until the time his deposition was taken on December 9, 1966, he had laid off a total of three days for illness, November 11 and 12, 1965, and August 18, 1966. These illnesses were unrelated to the accident. Sleeman's payroll records indicate that from December 9, 1966 to November 1, 1967, he had little, if any, time off.

Congress has provided by Section 51 of Title 45 of United States Code that:

"Every common carrier by railroad while engaging in [interstate] commerce * * * shall be liable in damages to any person suffering injury while he is employed by such carrier in such commerce, or, * * * for such injury or death resulting *'in whole or in part'* from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbeds * * * or other equipment." (Emphasis supplied.)

The intent of Congress in passing this Act is described in Rogers v. Missouri Pacific Railroad Company, 352 U.S. 500, 77 S.Ct. 443, 1 L.Ed.2d 493 (1957). The Court stated:

"Judicial appraisal of the proofs to determine whether a jury question is presented is narrowly limited to the single inquiry whether, with reason, the conclusion may be drawn that negligence of the employer played any part at all in the injury or death. Judges are to fix their sights primarily to make that appraisal and, if that test is met, are bound to find that a case for the jury is made out whether or not the evidence allows the jury a choice of other probabilities. *The statute expressly imposes liability upon the employer to pay damages for injury or death due 'in whole or in part' to its negligence.*

"The law was enacted because the Congress *was dissatisfied with the common-law duty of the master to his servant.* The statute supplants that duty *with the far more drastic duty of paying damages* for injury or death at work due *in whole or in part to the employer's negligence. The employer is stripped of his common-law defenses and for practical purposes the inquiry in these cases today rarely presents more than the single question whether negligence of the employer played any part, however small, in the injury or death which is the subject of the suit. The burden of the employee is met, and the obligation of the employer to pay*

*damages arises, when there is proof, even though entirely circumstantial, from which the jury may with reason make that inference.*

"The Congress when adopting the law was particularly concerned that the issues whether there was employer fault and whether that fault played any part in the injury or death of the employee should be decided by the jury whenever fair-minded men could reach these conclusions on the evidence. Originally, judicial administration of the 1908 Act substantially limited the cases in which employees were allowed a jury determination. That was because the courts developed concepts of assumption of risk and of the coverage of the law, which defeated employee claims as a matter of law. Congress corrected this by the 1939 amendments and removed the fetters which hobbled the full play of the basic congressional intention to leave to the fact-finding function of the jury the decision of the primary question raised in these cases—whether employer fault played any part in the employee's mishap.

"Cognizant of the duty to effectuate the intention of the Congress to secure the right to a jury determination, this Court is vigilant to exercise its power of review in any case where it appears that the litigants have been improperly deprived of that determination. Some say the Act has shortcomings and would prefer a workmen's compensation scheme. *The fact that Congress has not seen fit to substitute that scheme cannot relieve this Court of its obligation to effectuate the present congressional intention by granting certiorari to correct instances of improper administration of the Act and to prevent its erosion by narrow and niggardly construction.* Similarly, once certiorari is granted, the fact that the case arises under the Federal Employers' Liability Act cannot in any wise justify a failure on our part to afford the litigants the *same measure of review on the merits as in every other case.*

"The kind of *misconception evidenced in the opinion below, which fails to take into account the special features of this statutory negligence action that make it significantly different from the ordinary common-law negligence* action, has required this Court to review a number of cases. In a relatively large percentage of the cases reviewed, *the Court has found that lower courts have not given proper scope to this integral part of the congressional scheme.* We reach the same conclusion in this case. The decisions of this Court after the 1939 amendments teach that the Congress vested *the power of decision in these actions exclusively in the jury in all but the infrequent cases where fair-minded jurors cannot honestly differ whether fault of the employer played any part in the employee's injury.*" 352 U.S. at 506–510, 77 S.Ct. at 448–451. (Emphasis supplied; footnotes omitted.)

Plaintiff alleges that the defendant was negligent in failing to provide him with a safe place to work in the following respects: (a) failure to provide and maintain adequate and safe lighting for its parking lot; (b) failure to properly design, lay out, and construct its parking lot with respect to vehicular traffic and the safety of pedestrians; and (c) failure to take proper or customary measures to warn or protect pedestrian traffic in a badly lighted and designed parking lot.

The Wyoming Yards parking lot serves widely divergent purposes. In addition to providing parking spaces for employees and train passengers, the lot is used by taxi cabs, mail and freight trucks, service vehicles and various types of tractors and vehicles normally used at a railroad yard. Except for lines on the pavement designating parking stalls, there is a complete absence of any restrictive signs, barriers, painted crosswalks, or other kinds of traffic regulators.

We are compelled to conclude that in constructing this parking lot defendant

was not concerned with safety. Its primary concern was economy. In designing and constructing the lot, it used as its north star Figure 48 on Page 108 of a document which is plaintiff's Exhibit 14, entitled "Parking Lot Layout, Two Rows of Cars—90 Degrees South, Self-Parking-224 Square Feet Per Car, Plan Number 4." There is a design, and below the design it says, Figure 48, *"Parking at 90 Degrees is the most economical of space because there is less waste space.* Hence, when land is expensive and the rate of turnover does not justify ample parking, this plan is recommended. It is used almost exclusively in garages because of the cost per square foot." (Emphasis supplied.)

The only addition defendant made to that plan was to increase the area of each parking space. Its engineer, Mr. Manning, never consulted a traffic engineer or a safety engineer; his plan evidenced no real concern about traffic flow, no effort to separate pedestrian traffic from vehicular traffic. It is readily apparent that with a slight amount of imagination, cost, and inquiry into the then existing body of knowledge about safety standards for parking lots, built-in safety factors could have been provided. But defendant's motivation and concern were toward economy, not safety.

■■ The railroad is charged with knowledge of current engineering safety "know-how." It has a duty to apply such "know-how" in its design, construction, and maintenance of a parking lot used by its employees to avoid foreseeable injuries to its employees.

The design, construction, and maintenance of defendant's economy package parking lot are void of safety engineering "know-how." The lot does not have a single significant traffic engineering device.

■ To the prudent eye it was reasonably foreseeable that given the inadequate lighting and unsafe design relative to traffic control, an accident such as the one in this case would occur. The essence of negligence is lack of care.

And the defendant is guilty of negligence which more than slightly contributed to the plaintiff's injuries.

The testimony clearly and substantially preponderates in favor of plaintiff. Defendant's negligence contributed to the plaintiff's injury. It designed and maintained an inadequately lighted and faultily designed parking lot which was an unsafe place to work.

The statute expressly imposes liability upon the employer to respond in damages for injuries or death "[due] in whole or in part" to its negligence. Had the parking lot been adequately lighted, Parker would have been able to see Sleeman in time to avoid the accident. Also, had the vehicular and pedestrian traffic been separated by properly marked lanes, painted crosswalks and other appropriate traffic safety devices, including if need be, pedestrian signs such as one finds at airports where pedestrian and vehicular traffic intersect, this accident could have been prevented. This is a common practice today, and parenthetically, was common practice in 1958.

■ The railroad had a duty to continually exercise due care in both establishing and maintaining a safe place for its employees to work. The presence of other casual factors does not relieve the railroad of this primary duty. The inadequate lighting and economy package design were not simply circumstances which created a condition out of which a negligent event arose; on the contrary, these were continuing proximate causes. It was a continuing circumstance of negligence. The railroad has a duty to keep abreast of advances in safety engineering and designing. This duty is implicit in the Federal Employers' Liability Act. The testimony of plaintiff's expert, Mr. Arthur Gibson, evidences defendant's failure to keep current in parking lot safety.

Mr. Gibson is an expert of pre-eminent qualifications. He has served as a traffic engineer in the Michigan State Highway Department and has been with the City of Detroit for approximately twenty

years. He has also engaged in private design and consultation in parking lot construction. In this respect he assisted with the construction of parking facilities at the University of Michigan, which are quite substantial.

Mr. Gibson testified that the lot as it was laid out was unsafe. He observed that the widely divergent uses of the lot are inconsistent with modern parking lot design, since in addition to segregating pedestrians from vehicular traffic, vehicles should also be segregated according to their functions. Had this been done, the truck would never have been where Sleeman was.

Gibson said that the aisleways which now exist at the lot are in effect major streets. He observed that the absence of restrictive signs on or near the aisleways could create numerous conflicts between incoming and outgoing traffic. He stated that for at least fifteen years modern parking lots have had one-way aisles.

■ The Wyoming Yard was built in 1958. Gibson concluded that the lot was large enough to permit planning in accordance with today's standards. His testimony was reasonable relevant and persuasive.

As to whether this lot was adequately lighted, Gibson testified that he had prescribed one-half footcandle per square foot for industrial and student parking lots, and that the Illuminating Engineering Society called for at least one to two footcandles per square foot for parking lots.

Plaintiff's Exhibit 20 sets forth light measurements made by defendant's Chief Electrical Engineer on August 16 and 19, 1965, at about 10:00 P.M., at the Wyoming Yards. Although these readings were taken under favorable conditions and on a clear night, they fall short of the minimum standards recommended in the Illuminating Engineering Society Handbook, the authority relied upon by Mr. Edwards, defendant's superintendent of electrical construction and maintenance.

"Parking Areas 13–11, Parking Area Lighting, Illumination Requirements," of the Handbook, provides:

"The illumination requirements of a parking area (see Fig. 9–53, Exterior Lighting portion) depend on the type of usage the area receives. *Reasonably uniform illumination is desirable, that is, the lowest footcandle value at any point on the pavement should not be less than one-fourth the recommended average.* The small suburban shopping area design may result in illumination which is decorative, as well as functional." (Emphasis supplied.)

The recommended average for self-parking areas such as the Wyoming Yards parking lot is one footcandle per square foot. (See I.E.S. Handbook, Levels of Illumination (Exterior) 9–59.) Defendant's readings range from 0.1 to 0.5, an average of approximately one-quarter footcandle per square foot.

Plaintiff's Exhibit 20 (Column A) contains the light readings in the parking lot with the diesel house floodlights off. These readings are below even the minimum standards required by the I.E.S. Handbook.

There is testimony which establishes that on the night of the accident the floodlights on the diesel house were out. This testimony is persuasive, particularly in light of Parker's statement that as he was looking down the roadway the only illumination he had was from his headlights.

The defendant points out in cross-examination that Mr. Parker said that one of the reasons why he could not see was because of the rain and the failure of the windshield wiper to clear all of his windshield. While this was an answer to one question, when his whole testimony is considered, it is apparent that this was not the only reason why he could not see. What he said about visibility must also be considered in the light of his testimony that the only illumination he had while driving was from his headlights.

Defendant argues that residential street lighting standards are applicable to its lot. Irrespective of what standards are applied, Parker's testimony unquestionably establishes that the lighting was totally inadequate on March 26, 1963.

■ Adequate parking lot lighting encompasses at the very least sufficient lighting to meet the needs of both pedestrians and drivers under either favorable or unfavorable conditions. Defendant did not provide adequate lighting under either condition. Its negligence is clear and convincing.

All that other witnesses may have seen from better lighted positions and under more favorable conditions cannot change the circumstances under which Parker operated the truck, where he could not see in the darkened, shadowy, illusory area which prevailed on March 26, 1963.

During "Re-Examination," Mr. Gibson testified as follows:

"Q. If light readings had been taken last night at the parking lot of the defendant and the readings were the same as those set forth on plaintiff's Exhibit 20, would you say that there was adequate illumination in the parking lot?

"A. If a set of readings had been taken last night and showed the same range of readings as the exhibit in front of me, I would have to say the lighting is not satisfactory because we range all the way from five-hundredths of a footcandle up to four-tenths of a footcandle, which indicates that there are many areas of shadow and many areas of contrasting brilliance, which is not good lighting.

"Q. Is the lighting at this particular parking lot uniform?

"A. No, it is not. The areas in front of the depot closest to the tracks where the big floodlights are is very bright, and there are shadows in front of the depot, and there are shadows over towards the diesel house. So, the entire area which is utilized for parking has a lot of differential so far as levels of lighting."

Defendant's measurements and calculations which purport to establish that the lot was properly constructed are the products of hindsight instead of foresight. If defendant had applied diligent foresight instead of calculated hindsight in its design and construction of the parking lot, plaintiff would not have been injured.

In this regard, Gibson testified:

"Q. Could this have been designed as a clearly identifiable pedestrian walk?

"A. Yes, sir.

"Q. What would you have done in that regard?

"A. Well, first of all, the whole area should be redesigned to segregate all the traffic movements that I pointed out before, and employees should have a parking space, or parking bay at least, assigned to him as close as possible to where he normally works to minimize the amount of time he spends as a pedestrian in the parking lot. The same thing could have been done with the passenger car parking for patrons or people picking up train passengers. You can minimize the distance they have to walk in this lot by segregating a small lot immediately adjacent to the depot for them. And as I indicated, you could put posts around the depot, and along track number one, people who get on a train at the eastern end of track number one, there is nothing to prevent vehicles from driving right up along side of the train itself.

"Q. Is there anything at all in the way this parking lot is set out at present that would indicate that it was designed for pedestrian safety?

"A. Nothing. Not in my opinion, no.

"Q. Would you give the court just one illustration just how it might have been done so as to separate service traffic from pedestrian traffic?

"A. Well, for example, you could have eliminated this row of parking down here and put your major entrance road along this fence on the north edge of

the parking lot. And then turn these parking bays at right angles to the way they are so that the *pedestrian would walk down either to the depot or to the diesel house*. You also could have, with this major roadway here, provided one entrance to a small parking lot here which would be strictly for depot passengers; so that depot passengers would not find themselves down here in an area where they have no legitimate reason to be.

With the land that is available and with the use of some curbing or concrete parking barriers, you could easily segregate the various demands on this lot." (Emphasis supplied.)

If the parking lot had been properly designed, constructed, lighted, and maintained, the defendant's rhythm of one-truck, one-pedestrian, at one-place-accident, would be unnecessary.

■ After a careful evaluation of all the facts in this case, and the position of plaintiff at the time of the accident, the reasonable conclusion is that he was hit because Parker could not see him. I find plaintiff free of contributory negligence. I also find that defendant's negligence in failing to properly light and design its lot was a proximate cause of plaintiff's damages.

■ Faulty design and construction and/or inadequate illumination constitute continuing negligence. When these converge and join with other negligent factors and proximately cause injury to a railroad employee, the railroad must respond in full measure with compensatory damages to its injured employee.

■ We come to the question of damages. Having in mind the purpose of Congress in passing the Federal Employers' Liability Act for determining compensation, what we would call in state law parlance, Workmen's Compensation, it is apparent that it was intended to provide a means of compensation for on-the-job injuries sustained by employees of carriers subject to the Act.

■ Joseph Sleeman is entitled to compensation which adequately and fully

flows from the injuries he has sustained as a result of the defendant's negligence. Fair compensation is that which puts the plaintiff in as good a condition as he would have been if the injuries had not occurred. Anything short of this is inadequate. Olsen v. City of Dearborn, 290 Mich. 651, 288 N.W. 295 (1939); Fisk v. Powell, 349 Mich. 604, 84 N.W.2d 736 (1957); In re State Highway Commissioner, 249 Mich. 530, 229 N.W. 500 (1930); Grand Rapids & Indiana R. Co. v. Heisel, 47 Mich. 393, 11 N.W. 212 (1882).

■ Joseph Sleeman is permanently injured. Plaintiff has established a reasonable degree of probability that future damages will occur. These future damages are pain and suffering, impairment of earning capacity, and loss of physical power and vitality and capacity to enjoy the normal physical activities of life. Kellom v. City of Ecorse, 329 Mich. 303, 45 N.W.2d 293 (1951); Gardner v. Boyer's Estate, 282 Mich. 552, 276 N.W. 552 (1937); approving Brininstool v. Michigan United Rys. Co., 157 Mich. 172, 121 N.W. 728 (1909); Gilson v. Bronkhorst, 353 Mich. 148, 90 N.W.2d 701 (1958); Howell v. Lansing City Electric R. Co., 136 Mich. 432, 99 N.W. 406 (1904); DeMay v. Roberts, 46 Mich. 160, 9 N.W. 146 (1881). Future damages are to be reduced to present worth.

The life expectancy of plaintiff at his present age is fourteen years.

Table A of the Length of Working Life of Males, 1900 to 1965 U. S. Department of Labor and Manpower, Report Number 8, July 1963, gives the average working life for a man of plaintiff's age at 6.7 years. Defendant's witness, an actuary who is involved as an advisor to defendant's pension fund, arrived at a 3.6 year average working life. When persons such as defendant's witness make actuarial calculations, they recognize that if there is to be error, the error should be on the side of preserving the stability and integrity of such pension funds so that the demands for pensions can be met. It is like the life actuarial tables in life insurance policies. Experience had demonstrated

that the premium rates for life insurance policies based on actuarial tables have resulted in a substantially large profit to insurance companies because mortality was underestimated.[1] The more reasonable table is that of the United States Department of Labor which establishes this man's work life at 6.7 years.

Plaintiff was a very healthy man before the accident. He led what could be described as a vigorous life. It is not unreasonable under these facts to estimate the work life of plaintiff at 6.7 years.

The first full month before the accident, plaintiff's gross earnings for February 1963 were $629.23. On September 26, 1966, plaintiff was promoted to day coach foreman, and his gross monthly pay is now approximately $727.76 per month. There are two increases in pay as assistant coach foreman.

■ When plaintiff retires he will receive a pension from the defendant. Collateral source compensation does not operate to lessen the damage recoverable by an injured person from a wrongdoer. In United States v. Price, 288 F.2d 448, 451 (4th Cir., 1961), the court said:

"Moreover, although there appear to be no cases specifically deciding this precise issue, such authority as exists supports the view that benefits of this character should not be set-off against the recovery for tort. Several courts have had occasion to consider this question in relation to retirement benefits under the Railroad Retirement Act, 45 U.S.C.A. § 228a et seq. The retirement plan under that Act is very similar to the one under the Civil Service Retirement Act, in that a fund is created partly by contributions from the employees and partly by contributions from the employer railroads, with the Government making additional payments if needed. Upon disability, an employee may become entitled to the retirement benefits. Where railroad employees have been disabled bcause of negligence and have sued their employers under the Federal Employer's Liability Act, 45 U.S.C.A. § 51 et seq., the courts have uniformly held that the retirement benefits could not be considered in calculating damages. See: McCarthy v. Palmer, D.C. E.D.N.Y. 1939, 29 F.Supp. 585, affirmed 2 Cir., 1940, 113 F.2d 721, certiorari denied 311 U.S. 680, 61 S.Ct. 50, 85 L.Ed. 438; New York, New Haven & Hartford R. Co. v. Leary, 1 Cir., 1953, 204 F.2d 461; Sinovich v. Erie Railroad Company, 3 Cir., 1956, 230 F.2d 658; Hetrick v. Reading Co., D.C.D.N.J.1941, 39 F.Supp. 22."

As a result of the accident plaintiff sustained very severe personal injuries, including an evulsion laceration of the left leg and foot; lacerations of the right knee area, which go to vital structures of the moving parts of the leg with its multiples of nerves, blood vessels, muscles, cartilages, soft tissue, and bones; abrasions of the forehead and of the bridge of the nose, severe contusions and undermining of the skin of the right thigh; fracture of the right patella; and multiple lacerations of the dorsum of the right hand with exposure of extensor tendons. Plaintiff was pushed along the highway, and he left his skin and tissue clearly marked on the pavement. He suffered what the doctors said were very serious injuries.

---

1. Gregg, Life and Health Insurance Handbook, Page 117 (1959)—Irwin.
   Before the accident Sleeman was a healthy ablebodied man. The type of work which he was doing for the railroad was the kind in which, according to the testimony. persons continue to work after retirement age. The probability is that Sleeman would continue to work.
   The Retirement Board figure of 3.6 is the average time in which all railroad employees who are the same age as plaintiff may leave the railroad and go into other occupations in the labor market. Their pension is not affected by other occupational employment.
   The 6.7 figure is the average life expectancy in the labor market in general, and this is the work capability which the plaintiff had and which was greatly impaired in the manner and to the extent found in this case.

Plaintiff underwent surgery, including skin grafting, on March 26, 1963, April 12, 1963, and April 18, 1963. He was discharged from the hospital May 13, 1963, and resumed work on July 1, 1963. Plaintiff has and continues to experience pain, discomfort, impairment, and disability.

He presently suffers from loss of movement and tightness in the right knee, loss of strength in the right thigh and leg, and tiredness and pain in his left foot. He cannot walk more than 300 feet without resting, and his right knee stiffens whenever he sits for more than thirty minutes. These pains and discomfort awaken him at night. He has to take two to eight aspirin compounds a day.

His fellow employees testified that he evidences a notable limp while working. Defendant's supervisor said he did not notice any limp. Mr. Hansen, a fellow employee of the defendant, testified that subtle economic duress was exercised upon these employees before they were interviewed by defendant's claims agent. Mr. Smith, another fellow employee of plaintiff, said that the statements taken by the claims agent from him did not contain all of what he told the claims agent,

and contained some things that he had not told him. The composition of the statement clearly indicates that it was not drafted by an employee, but rather by the claims agent. With these facts in mind, this court is more inclined to place greater credence on the testimony of those employees who had the courage to say what they said from this witness stand than upon an employee who is an officer of the company.

We carefully observed each of these witnesses when they testified and find that there was economic duress exerted upon these employees.

Dr. Boelkins, who is the medical superintendent of the Northern Region of the C & O Railroad, examined the plaintiff in October 1967, after the plaintiff had requested a disability retirement. The Doctor testified only in reference to objective symptoms; he ignored plaintiff's statements about his pain and suffering. Plaintiff testified that his disabilities and pain tire him to such an extent that he cannot continue to work. In the Sixth Circuit there are many social security cases which hold that pain can be disabling.[2]

2. "This Court has repeatedly *held that pain itself can be the basis for an award of disability benefits.* Polly v. Gardner, supra [364 F.2d 969 (6th Cir.)]; Miracle v. Celebrezze, 6th Cir., 351 F.2d 361; Henninger v. Celebrezze, 6th Cir., 349 F.2d 808. To require a man to continue working under the burden and pressure of intense pain is incompatible with the beneficent purposes of the Act. *'Even pain unaccompanied by any objectively* observable symptoms, which is nevertheless *real to the sufferer and so intense as to be disabling, will support a claim for disability benefits.'* Miracle v. Celebrezze, supra, 351 F.2d at p. 374. See also, Ber v. Celebrezze, 332 F.2d 293 (C. A. 2). * * *

"The extent of an applicant's disability is determined by considering the condition of the particular applicant, and is not measured against the capabilities of the hypothetical average man. Also Brooks v. Gardner, 357 F.2d 110 (C.A. 5); Polly v. Gardner, supra. The fact that there may be a large element of psychosomatic overlay to an applicant's condition, does not

preclude an award of benefits. Pain, even if it is caused partially by an emotional problem of the applicant, is just as real to him and just as disabling. Miracle v. Celebrezze, supra; Beggs v. Celebrezze, 356 F.2d 234 (C.A. 4)." Walston v. Gardner, 381 F.2d 580 (C.A. 6, 1967).

"Pain was brushed aside as a subjective non-entity. Well reasoned opinions and the obvious purposes of the Act compel that great consideration be accorded to that merciless entity called 'pain'. The fact that some extra-ordinary individuals can bear it and perform unflinchingly does not mean that such heroics is the 'standard'. The criterion is not even the standard of the ordinary man or the average man; the standard is the individual claimant himself, with all his personal assets and liabilities. See the discussion of this by Judge Simons in Hill v. Celebrezze, supra [D.C.,] 233 F.Supp. 298, at page 301." Drafts v. Celebrezze, 240 F.Supp. 535, 538 (E.D.S.Car., 1965). Cited in Sayers v. Gardner, 380 F.2d 940 (C.A. 6, 1967); also cited in Polly v. Gardner, 364 F.2d 969, 973 (C.A. 6, 1966).

■ The medical superintendent under cross-examination acknowledged that he was only human, and that the existence of this lawsuit had some bearing on his judgment. Under these circumstances, it is proper to substantially discount his testimony insofar as it relates to the extent of plaintiff's present and future disability. We find that the plaintiff is suffering from pain and discomfort which is disabling. We further find from the testimony of Dr. Aitken as to plaintiff's condition, that it will not improve but will become increasingly worse, as it has progressively worsened since his discharge from the hospital.

■ We have examined Sleeman's injuries; they are extensive. There was extensive skin grafting of his stomach from just about the middle of the ribs down to the top of his thighs, and then down below the thigh there are scars where other skin grafts were taken; the right knee is not a pleasant sight. Even a look at the present structure and nature of his injuries substantiates his testimony that when he walks there is a grating and grinding sensation. He does suffer disabling pain. There should be no "narrow, niggardly" [3] interpretation of this disability. Rogers v. Missouri Pacific R. Co., supra.

The doctors testified they believed that Mr. Sleeman was an honest man; that he was a fine patient, that he was very cooperative; that he was an excellent worker before and after the accident. Mr. Sleeman continued to be a very excellent workman after this accident. His work record confirms his dedication to his work, his loyalty to the defendant. His testimony is credible.

In addition to the above damages, plaintiff's capacity for enjoyment of life has been significantly diminished. His right knee is mutilated and permanently disfigured, and this condition, together with the scars on his ankle and on his stomach from which the skin grafts were taken, have caused the plaintiff considerable embarrassment and psychological distress.

His social and recreational activities have also been curtailed. On a recent vacation he was limited to resting in his home. Previously he was a huntsman and active outdoors man; now, when he hunts, he is confined to sitting on a stump thirty or forty yards from his cottage. He cannot mow the grass; his wife does most of the driving. He can't wash windows as he did before. When he walks downstairs, he has to pull his right leg behind him.

3. FELA is a remedial humanitarian statute, and it must be construed liberally to secure Congressional intent. Cf. Helvering v. Davis, 301 U.S. 619, 672, 57 S.Ct. 904, 81 L.Ed. 1307; Carroll v. Social Security Board, 7 Cir., 128 F.2d 876; Polly v. Gardner, 364 F.2d 969, 6 Cir., 1966; Combs v. Gardner, 382 F.2d 949, 6 Cir., 1967; Copper Range Co. v. Michigan Unemployment Compensation Commission, 320 Mich. 460, 468–469, 31 N.W.2d 692 (1948); Godsol v. Unemployment Compensation Commission, 302 Mich. 652, 5 N.W.2d 519, 142 A.L.R. 910; O'Brian v. Michigan Unemployment Compensation Commission, 309 Mich. 18, 23, 14 N.W.2d 560 (1944); Auten v. Michigan Unemployment Compensation Commission, 310 Mich. 453, 455, 456, 17 N.W.2d 249 (1945): Walston v. Gardner, 381 F.2d 580, 6 Cir., 1967.
"Moreover, '[w]hat constitutes negligence for the statute's purpose is a federal question, not varying in accordance with differing conceptions of negligence applicable under state and local laws purposes. Federal decisional law formulating and applying the concept governs.' Urie v. Thompson, 337 U.S. 163, 174, 69 S.Ct. 1018, 93 L.Ed. 1282." Rogers v. Missouri Pac. R. Co., 352 U.S. at p. 507, 77 S.Ct. at p. 449.
The Supreme Court in using the words "narrow and niggardly," first related them to the construction of a social remedial act, and second with reference to court erosions of awards under the Act.
The word "niggardly" was deliberately used, and is defined in Webster's International Dictionary, Third Edition, as: "grudgingly loath to part with money or possessions or to grant favors * * * marked by scantness: provided in meanly limited supply."

Plaintiff has endured substantial pain and suffering since the date of his injury. We have examined with care and thoroughly considered the computation of damages proposed by the plaintiff. We find in all particulars that they are reasonable and in accord with a proper evaluation of pain and suffering, loss of physical power, vitality, enjoyment of life, and impaired earning capacity.

We therefore find for the plaintiff in the sum of $88,671.08.[4] Judgment may be entered accordingly.[5]

The foregoing shall stand for findings of fact and conclusions of law as required by Rule 52(a) of the Federal Rules of Civil Procedure.

It is so ordered.

4. Computation of damages (Plaintiff's brief, pp. 10–11):

Pain and suffering:

| | |
|---|---:|
| Fourteen weeks (from date of injury to date of return to work) at $130.00 per week | $1,820.00 |
| 228 weeks (from date of return to work to date of trial) at $25.00 per week | 5,700.00 |
| Future—at $25.00 per week ($1,300 a year) for period of life expectancy (14 years) reduced to present value —$1,300 × 9.899— | 12,868.70 |
| | $20,388.70 |

Loss of physical power, vitality and enjoyment of life:

| | |
|---|---:|
| Fourteen weeks (from date of injury to date of return to work) at $25.00 per week | $350.00 |
| 228 weeks (from date of return to work to date of trial) at $10.00 per week | 2,280.00 |
| Future—at $10.00 per week ($520.00 a year), for period of life expectancy (14 years) reduced to present value $520.00 × 9.899— | 5,147.48 |
| | $7,777.48 |

Impaired Earning Capacity

| | |
|---|---:|
| Loss of earnings (3–26–63 to 7–1–63) | $1,993.00 |
| Work Life Expectancy of 6.7 times current yearly income of $8,733.12 | 58,511.90 |
| Gross per month is currently $727.76 | |
| | $60,504.90 |
| | $88,671.08 |

The computation as to pain and suffering is reasonable since the evidence establishes a degeneration in plaintiff's condition and an increase in pain and discomfort to the extent that in the future period of his life expectancy compensation for pain should be greater than that computed by the plaintiff. The computation for work life expectancy, although it was reduced to present worth, was not counterbalanced by such factors as increases in price levels in productivity factors which generally pressure increases in wages.

An economist, such as Professor Henderson, of the Michigan State University, holds a contrary position to that of defendant's expert in the instant case, and in recent years his testimony in other cases in this court has supported justification for offset of discount to present worth of future earnings by increased earning and appreciation factors.

———◆———

5. Cases cited by defendant on issue of liability are factually distinguishable from the instant case. In some of these cases the lower courts may have misread Rogers, supra.