**Monique G. CARON et al.**

v.

**UNITED STATES of America.**

**Civ. A. No. 74–130.**

United States District Court, D. Rhode Island.

Sept. 30, 1975.

Supplemental Opinion Feb. 9, 1976.

---

382

John F. Dolan and Leonard A. Kiernan, Jr., Providence, R. I., for plaintiffs.

Lincoln C. Almond, U. S. Atty., Everett C. Sammartino, Asst. U. S. Atty., Providence, R. I., for defendant.

## OPINION

PETTINE, Chief Judge.

This is a negligence action against the United States alleging tortious conduct in the administration of certain inoculations to the infant plaintiff Monique by army medical personnel at Custer Air Force Base, Battle Creek, Michigan.

At issue is the government's negligence and validity of its plea that the action is barred by the statutory period of limitation set forth in the Federal Tort Claims Act.

Jurisdiction is founded in 28 U.S.C. sec. 1346(b). There is no dispute that the provisions of 28 U.S.C. sec. 2675(a) have been fully satisfied.

## FINDINGS OF FACT

On August 12, 1963, plaintiff, Annette R. Caron was in Michigan at Custer Air Force Base where her husband, Ernest Caron, then on active military duty, was stationed. On this day she took their healthy and normal four month old baby girl, Monique, to the base dispensary for immunization injections usually given to infants. At the dispensary, after signing a log and stating the purpose of her visit, she was referred to an airman. Without taking any history or making any inquiries, the airman administered to Monique "DPT" (a combination of three vaccines, Diphtheria, Pertussis, and Tetanus), typhoid injections, and oral polio vaccine. According to Mrs. Caron, whose uncontradicted testimony this Court accepts as entirely credible, the airman, after having given the injections, " . . . took a yellow pamphlet and on the first page wrote, 'DPT IV, Captain Merkle', . . . turned the page, wrote 'oral polio, Captain Merkle', . . . then on the last page . . . stamped 'Typhoid, 5 Mil., Captain Merkle.' " No Captain Merkle was present at the time. A copy of this record was given to Mrs. Caron, but she no longer knows where it is.

Approximately one hour later Monique's left arm started "jerking, twitching", and "she was burning with fever". Mrs. Caron immediately returned to the dispensary with Monique. In her presence, an army physician, Dr. Goulet, together with nurses undressed Monique and sponged her with towels. Mrs. Caron was then asked to leave the room. About an hour later a nurse told her they could not stop the convulsions and were going to send the baby to a civilian hospital. This, however, was not done. Another hour passed before Mrs. Caron was allowed to see her baby, who was no longer convulsing. Dr. Goulet, when asked the cause of Monique's convulsions by Mrs. Caron, stated he did not know

and asked Mrs. Caron to find out if there was any history of convulsions in the family. Dr. Goulet placed Monique on phenobarbital and gave instructions to report to him the following week.

The dispensary record for this date reads in pertinent part:

"Patient convulsed in grand mal fashion for almost forty-five minutes . . .

Examination essentially negative, except for sluggish . . .

Presumed this is a febrile convulsion secondary to typhoid inoculation."

Despite the reference in the dispensary record suggesting the convulsion occurred in reaction to the typhoid inoculation, there is no evidence that this record was ever given, or its contents revealed, to Mrs. Caron. To the contrary, as appears in the ensuing narrative, this reference was equally ignored by army physicians who subsequently treated Monique and were at a loss to identify the cause of her convulsions.

Mrs. Caron returned to the dispensary on August 19 to see Dr. Merkle and report that an aunt and two cousins had suffered convulsions from fever.

Because Monique was irritable, not eating and constantly crying, Mrs. Caron again returned to the dispensary on August 21 and 29. On the latter date she was told by Dr. Goulet that her baby had been convulsing due to a high fever, but was going to be all right.

The dispensary record for August 29 reads:

"Mother quite hostile and blames change in child's eating behavior on recent convulsion episode . . .

Mother reassured and advised. Belligerent mother 'wants record.'"

Mrs. Caron told Dr. Goulet she wanted the records because she intended to see a private pediatrician. She abandoned the idea when reassured by Dr. Goulet that there was no need for a private consultation.

A recitation of these sombre events as well as those which followed, is indispensable to a resolution of the legal issues presented herein, and the remainder shall be set forth *seriatim*:

*November 7, 1963.* Monique convulsed at home and was seen by Dr. Goulet at the dispensary. After an examination, he prescribed aspirin, stating that there was no sign of an infection and that everything was all right.

*November 9, 1963.* Monique suffered her third convulsion; the baby had a slight temperature. Dr. Goulet prescribed aspirin and phenobarbital, stating that Monique would be on phenobarbital for a year or two. Dr. Goulet told Mrs. Caron that he did not know what caused the convulsions.

*December 5, 1963.* Having convulsed two days before, Monique was again seen by Dr. Goulet. He advised Mrs. Caron, who was coming to Rhode Island, to consult a local doctor.

*December 21, 1963.* In Rhode Island, Mrs. Caron saw Dr. Julius Stoll, a neurosurgeon. Dr. Stoll advised mother he could not state the cause of Monique's convulsions.

At the trial, Dr. Stoll testified that on this visit the neurological examination was completely within normal limits. He did not really have an opinion as to the cause of the convulsions, but felt "that it was a seizure or convulsion problem that should be treated at that time as it was with anti-convulsant medication, then at a later date . . . further tests should be performed to clarify the cause . . ."

Some time thereafter Mrs. Caron returned to Custer Air Force Base.

*February 1, 1964.* Sometime between 9:00 and 10:00 a. m., Mrs. Caron found Monique unconscious in a pool of saliva; Monique was examined at the dispensary by Dr. Merkle. Monique apparently stopped convulsing; mother advised to take her baby home and watch her. Mrs. Caron asked if the child could be hospitalized, but Dr. Merkle responded, "Just take her home and watch her."

*February 2, 1964.* At 4:00 a. m. Monique was found convulsing in her crib.

Dr. Merkle had the parents bring the child to Leila Post Hospital, a private non-government hospital about five miles from the dispensary. The Army arranged for the baby to be seen by a Dr. Levy. Apparently the convulsions stopped in transit to the hospital; however, at the hospital they started again and Monique was placed under oxygen. A neurosurgeon, Dr. Griffith, who was then in surgery, was called, but did not appear until four hours later. During this time Monique was convulsing, i. e. "She was hot, she was jerking her whole body."

Dr. Griffith "put her on a mattress, a special mattress to control her temperature" and injected her with different medications. Monique stopped convulsing. Dr. Griffith told Mrs. Caron that Monique would never be the same again; when asked, he stated he did not know what caused the convulsions.

Monique remained at the hospital for a week under Dr. Griffith's care. On discharge Dr. Griffith stated he wanted to see the child again. Mrs. Caron asked Dr. Merkle for authorization to make such a visit so that the Army would pay for it. Dr. Merkle stated the Army would not assume this expense as they did not "find it necessary".

*April—August 1964.* Mrs. Caron and Monique were in Rhode Island.

*June 1964.* Mrs. Caron consulted a Dr. Lancaster who referred her to the Boston Children's Hospital.

*June 1964.* The baby was seen by doctors at Boston Children's Hospital. They stated that Monique had low resistance to fever and this caused the convulsions. Mrs. Caron was further advised that she was "lucky to have Monique, she was a happy, healthy, chubby baby and to look around, look at other children, and I had nothing to worry about, and they told me Monique was apparently teething, and this was causing fever".

*April 1965.* With Mr. Caron discharged from military service, the family returned to Rhode Island.

*May 1965.* Dr. F. Edward Yazbak, a local practitioner, was consulted and referred the case to a neurologist, Dr. Taft, who hospitalized Monique for tests. At the conclusion of the hospitalization, Dr. Taft stated he did not know what was causing the convulsions.

*March 1966.* The Carons consulted Dr. Eric Denhoff, a licensed practitioner in Rhode Island and a specialist in pediatric neurology and neuro developmental pediatrics. He stated the child's condition was "bad" and hospitalized her to see how she might be treated "more effectively". A number of tests and studies were conducted to "try to control the convulsions". From March 1966 to 1970 Monique remained under his care. Her condition became progressively worse; during this period there were eleven hospitalizations to try to control the convulsions. Because of persistent brain wave patterns in the temporal lobe, a temporal lobotomy was performed. "[T]he results were nebulous." At this time Dr. Denhoff had no opinion as to the cause of the convulsions; he was more "concerned with trying to control the convulsions than formulating an opinion as to possible cause . . . except to rule out a brain tumor or progressive neurological disease . . . "

*1970.* The Carons, not being able to cope with Monique, went to New York and placed her in a special school. The same problems continued to exist. On recommendation of Dr. Denhoff, a Dr. Preston Robb in Montreal, Canada was consulted. Dr. Denhoff stated that he considers Dr. Robb to be "one of the outstanding pediatric neurologists in the world". After hospitalization and testing, Dr. Robb advised the parents he could not help Monique with her convulsions; he also stated he did not know what caused them.

*1972.* Monique was placed in the Ladd School for handicapped children in Rhode Island, and Mrs. Caron again consulted Dr. Yazbak. At this point all the medical records were requested from the Leila Post Hospital by Dr. Yazbak.

*October 1972.* After reviewing the medical records, Dr. Yazbak stated that it was his opinion Monique's condition was due to the injections she received on August 12, 1963, at Custer Air Force Base.

This was the first time that Mrs. Caron and her husband were told that the cause of Monique's condition was the injections administered in 1963.

*December 1972.* The Carons consulted their attorney.

It should be added here that in her consultations with the various doctors, Mrs. Caron told each of them about the injections Monique had received.

Dr. Yazbak testified that in 1963 it was universally known that there was a definite risk in using pertussis vaccine in children who have family history of convulsive disorders and that "DPT", which has pertussis vaccine as part of the combination, should not be administered without first taking a detailed history and doing a complete physical. He further stated that a typhoid inoculation should be given only if 'the family is going to or is living in an area endemic to typhoid; and that the term "5 Mil." represents .5 milliliters, a dosage recommended for an adult, which should not be given to a child. He concluded that in his opinion the combination of "DPT" and "typhoid", as administered to Monique, was the "precipitating cause" of her convulsions, with complicating *sequelae* in "the line of brain damage . ., mental retardation or hyperactive behavior to follow." Dr. Yazbak further testified that "under no circumstances would he give a typhoid injection to a baby", and that though he had administered such injections to children in Egypt, he had never given "half a cc [as injected in this case] to a four month old baby . . . [that a] 250-pound male will get half a cc."

Dr. George Peter, a certified pediatrician specializing in infectious diseases and with training in immunology, holds the position of assistant professor in pediatrics in the Brown University medical program. He testified that a .5 milliliter injection of typhoid vaccine should not be given to a child of four months and that, in his opinion, the combination of "DPT" and typhoid injections as given to Monique were "very likely . . . implicated in the subsequent convulsions". His opinion was based on the degree of diligence and skill universally possessed by the medical profession in 1963. On cross-examination he further stated:

> "With respect to the DPT which the child received in the normal dosage, I would say there was no obvious negligence, however, in the case of typhoid I think this was gross negligence to have administered five times the dose that you would give if you would have to give that vaccine to a child at that age."

I note here that the doctors agreed that "5 mil." as Mrs. Caron saw recorded by the airman on August 12, 1963 is subject to no other interpretation than ".5 milliliters."

Dr. Stoll, whose vita of honorary positions, writings, specializations and teaching as professor at Brown University need not be detailed, after reviewing all the medical records together with his own examination and treatment of Monique, concluded that the seizures experienced by Monique on August 12, 1963, constituted an "adequate" cause to damage the brain sufficiently to cause future seizures; that there was a direct causal relation between the injections received by Monique on August 12, 1963 and the convulsions she suffered; that there is reasonable certainty such convulsions, by interfering with the oxygen supply to the brain, caused fixed brain damage. He further stated that in his opinion "the background history of febrile seizures lasting . . . at least an hour have all contributed to having an accumulated effect on Monique Caron as we see her today, a mentally defective, not mentally retarded child who still has uncontrolled seizures, who has disturbed behavior and has a very guarded outlook for the rest of her life."

Dr. Denhoff was of the same opinion as the other doctors. Nevertheless, I

feel it is appropriate to record the following significant testimony he gave: "the standard procedure was [in 1963] as always had been[:] . . . [to do] a history of whether or not there is any evidence of convulsions in the family . . . [A .5 milliliter dosage of typhoid vaccine is] almost sub-lethal for a child of four months . . . The standard [of care as to typhoid injections] as of 1963 was no different than it is today or different than when I went into practice in 1948."

Dr. Goulet was the only witness for the government. His testimony in no respect undermined the plaintiffs' case. The court concludes, as will be discussed further, *infra,* that the plaintiffs have more than sustained their burden of proof to establish the government's negligence.

■ To this tragic tale of suffering, that presents the spectre of Monique's

destroyed mind, the government interposes the defense of the statute of limitations. I do not quarrel with the rationale underlying a statute which prescribes the time limit within which a defendant must be sued. There is, of course, merit to the argument that "[e]ssential justice requires prevention of the imposition of liability upon physicians who, because of the passage of time, have become disempowered to present meritorious defenses . . . ." *Ashley v. United States,* 413 F.2d 490, 493 (9th Cir. 1969). However, where there are no facts to indicate that, because of the passage of time, the government has been disempowered to present a genuine defense to its own negligent conduct, the government's role as the representative of *all* the people would seem to require it to take a broad approach in seeking to apply, where there is an arguable choice, that interpretation of the law and facts which best serves justice.[1]

---

1. In a case strikingly similar to the one at bar, *Portis v. United States,* 483 F.2d 670 (4th Cir. 1973), the Fourth Circuit was also constrained to comment on the government's rather heartless response to a tragic situation:

 "This is an appeal from dismissal of a complaint under the Federal Tort Claims Act, 28 U.S.C. § 1346(b). Leslie Portis, age nine, is the real plaintiff, and is now almost totally deaf allegedly as the result of medical malpractice in an Air Force hospital in 1963. The United States concedes the malpractice, and yet, incredibly, interposes the bar of the two-year statute of limitations.
 The reasons advanced for the enactment of statutes of 'repose' are these: a 'stale' claim may be more readily asserted fraudulently and the passage of time hampers defense, e. g., records may have been lost, witnesses may have died. That there is no reason to interpose a plea in bar against a just claim is reflected in the rule in some jurisdictions that the pleading of a statute of limitations is discretionary even for fiduciaries. *E. g.,* 31 Am.Jur.2d Executors & Administrators § 738 (1967)." *Id.* at 670–671.

 Compare Judge Magruder's comment in *Tessier v. United States,* 269 F.2d 305, 307 (1st Cir. 1959) ("This is unquestionably a sad case, in which the United States is using the statute of limitations to defeat a meritorious claim . . . brought . . . under the Federal Tort Claims Act.") in which the government's defense was upheld.

 To give the government its due, however, it must be recalled that the two-year limitation on actions brought against the government under the F.T.C.A. is not waivable but jurisdictional:
 "It is established beyond question that Section 2401(b) is not a statute of limitations, within the legal definition of that term, *Simon v. United States,* 244 F.2d 703 (5th Cir., 1957); *Compagnie Generale Transatlantique v. United States,* 51 F.2d 1053 (2nd Cir., 1931); *United States ex rel. Rauch v. Davis,* 56 App.D.C. 46, 8 F.2d 907 (1925); but that it imposes as a jurisdictional prerequisite to recovery, a substantive condition, qualification, or restriction on both the right and remedy of the plaintiff and on the suability of the United States. Thus, the effect of the passage of more than two years after the claim accrues, without commencement of action upon it, is to leave the courts without jurisdiction of the action, whether the statute is pleaded or not, and to leave forever barred the right, the remedy, and the liability. [citations omitted]." *Quinton v. United States,* 304 F.2d 234, 242 (5th Cir., 1962) (Hutcheson, J., concurring specially).
 Thus in a case where the running of the two-year period is free from doubt, a court would be bound to raise that issue itself. Fed.R. Civ.P. 12(h)(3). *See, e. g., Eastern Freight Ways, Inc. v. United States,* 257 F.2d 703, 705 (2d Cir., 1958).

## APPLICABLE LAW IN DETERMIN-ING ACCRUAL OF ACTIONS UNDER THE F.T.C.A.

Under the Federal Tort Claims Act, "[t]he United States shall be liable . . in the same manner and to the same extent as a private individual under like circumstances", 28 U.S.C. sec. 2674, on claims against the government for personal injury "caused by the negligent or wrongful act . . . [of its employees] while acting within the scope [of their employment] . . ., under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. sec. 1346(b). Any such action must be asserted "against the United States . . . within two years after such claim accrues". 28 U.S.C. sec. 2401(b). Exclusive jurisdiction to hear these actions is conferred upon the federal district courts. 28 U.S.C. sec. 1346(b).

■ Over the years problems have arisen over the interpretation of the Federal Tort Claims Act. There is a divergence of opinion as to whether state or federal law applies to determine when the plaintiff's claim accrued. Since 1962 the federal courts addressing the issue have espoused a bifurcation of concepts, establishing that federal law shall determine the accrual point while the *lex loci* shall control the substantive rights of the parties.[2] These federal cases uniformly hold that, under the federal rule, a malpractice action against the government, accrues when the plaintiff discovered, or in the exercise of reasonable diligence should have discovered, the acts constituting the alleged malpractice, and thus refuse to apply the more rigid, and often unfair, rules of some states as discussed in note 4, *infra*. Application of a federal rule, it is argued, provides greater uniformity in the administration of the Federal Tort Claims Act and "eliminate[s] discrimination among claimants caused by differences in the law of the states".[3] However, I need not engage in an extended legal analysis of the merits of this position because the First Circuit Court of Appeals has ruled unequivocally that state law under the *lex loci* rule, determines when a claim accrues under Section 2401(b).[4]

**2.** The leading case, quoted in part in n. 3, *infra*, expounding this position is *Quinton v. United States,* 304 F.2d 234 (5th Cir., 1962); *see also Portis v. United States,* 483 F.2d 670 (4th Cir., 1973); *Tyminski v. United States,* 481 F.2d 257 (3rd Cir., 1973); *Toal v. United States,* 438 F.2d 222 (2d Cir., 1971); *Ashley v. United States,* 413 F.2d 490 (9th Cir., 1969).

**3.** "Malpractice—When Does a Malpractice Cause of Action Accrue under the F.T.C.A." 14 Syracuse L.Rev. 522.

In *Quinton v. United States, supra* at 236, the court stated:

"Obviously, if the various states' rules could severally determine when a claim accrued against the Government under Section 2401(b), the uniformity which Congress sought by enacting that section would be, for all practical purposes, a goal impossible of attainment. Differing state rules as to when a particular tort claim accrues would necessarily produce diverse decisions as to the effect of Section 2401(b). The mere alteration by a state of its rule as to the accrual of a particular claim would alter Section 2401(b) just as effectively as if Congress itself had formally amended that section. Thus, acceptance of the Government's view would permit the states to do indirectly what Congress clearly forbids them to do directly by increasing or decreasing their statutes of limitations on particular claims; and, contrary to the express purpose of Section 2401(b), claimants under the Tort Claims Act would have varying periods within which to bring suit against the Government depending solely on where their claims arose."

**4.** *Tessier v. United States,* 269 F.2d 305 (1st Cir. 1959). In view of my determination, *infra*, that both the federal rule and applicable state law utilize the discovery rule to determine when a claim of malpractice accrues, application of the *Tessier* rule in this case is almost academic. In *Tessier* itself, however, that was not the case: plaintiff's action was barred because Maine did not recognize the discovery rule. Furthermore, where state law does not recognize the discovery rule and the plaintiff is, for example, a minor, application of the *Tessier* rule can produce a result which is even harsher than would occur in that state's courts where minority, like incarceration or insanity, typically tolls the running of the state statute of limitations. Such a provision has no effect on the

In *Tessier v. United States,* 269 F.2d 305 (1st Cir. 1959), the court did not bifurcate concepts, but stated that:

"[U]nder the Tort Claims Act, . . Congress merely waived the sovereign immunity of the government, as a defense to litigation enforcing state-created substantive rights. The statute provides simply that '[t]he United States shall be liable * * * in the same manner and to the same extent as a private individual under like circumstances.' 28 U.S.C. § 2674. Thus a 'claim accrues' when a private person similarly situated would become

limitations provision of the F.T.C.A. *See, e. g., Mann v. United States,* 399 F.2d 672 (9th Cir., 1968); *Muldez v. United States,* 326 F.Supp. 692 (E.D.Va.1971).

Since the First Circuit rendered its decision in 1959, *Tessier* has suffered much criticism. In *Quinton v. United States, supra,* the Fifth Circuit criticized the *lex loci* rule of *Tessier* in the following passage and, citing *Tessier,* specifically declined to follow it:

"Interestingly enough, the field of malpractice claims presents a striking illustration of the ill effects which would be produced were we to accept the Government's theory. A majority of states adhere to the rule that a claim for malpractice accrues at the time of the wrongful act which constitutes the malpractice. In many of these states, however, exceptions have been engrafted upon this general rule. Thus, a number of states hold that, where the negligent physician continues to treat the injured patient after the initial negligent act, the statute of limitations begins to run from the date this treatment is terminated. Still other jurisdictions permit the injured patient to assert his claim for malpractice in the form of an action for breach of contract, or in the form of an action for fraud. A number of states, on the other hand, recognizing the injustice of the majority rule, have expressly rejected it in favor of a rule which permits the injured party to sue within a certain period after he has discovered, or in the exercise of reasonable diligence should have discovered, the facts upon which his claim is based. It is quite apparent, that application of these diverse rules under Section 2401(b) would produce diverse results as to the effect of that section, and would thereby discriminate among claimants solely on the basis of where the operative facts giving rise to their claims arose. We cannot believe that this is what Congress intended.

\* \* \* \* \* \*

suable under the law of the state." *Id.* at 309 (citations omitted).

In this case it is clear the tort occurred in Michigan on August 12, 1963 and thus, under *Tessier,* the law of Michigan determines when plaintiffs' claim accrued.

## The Law of Michigan

In January 1963 the limitation statute in Michigan applicable to malpractice cases did not embody the "discovery rule". The pertinent sections read:

"Sec. 5805. No person may bring or maintain any action to recover dam-

. . . Yet, if the Government's view were adopted, . . . the application of Section 2401(b) would turn entirely on the method chosen by the state to effectuate its policy in this area, even though those responsible for this choice undoubtedly gave no consideration to the effect which their decision would have on the Tort Claims Act.

We think such a result to be totally unjustifiable. Either the *entire* state scheme of limitations must be applied under Section 2401(b) or the state scheme must be ignored completely. Otherwise, we would often find ourselves following 'state law,' while reaching a decision completely at odds with a state's chosen policy. Since it is impossible, under the express language of Section 2401(b), to give the effect to state law in its entirety, we see no alternative but to disregard it completely.

\* \* \* \* \* \*

With deference to the Court of Appeals of the First Circuit, we think we have already demonstrated that its interpretation of our second Reid opinion, [*Reid v. United States,* 251 F.2d 691 (5th Cir., 1958)] is unsound; and, insofar as the Tessier case is contrary to the decision here reached, we must, for the reasons previously stated, reject it." *Quinton, supra* at 236, 238, 240 (footnotes omitted; emphasis in original).

The *Tessier* rule, has been rejected either directly or indirectly by all the Circuit Courts considering the issue afresh since 1959. *See* cases cited in n. 2, *supra.* This Court, of course, is bound by the First Circuit's decision in *Tessier,* but must, in all candor, confess that it was relieved to conclude that the federal rule and state rule which is to be applied herein are in harmony.

ages for injuries to persons . . . unless, after the claim first accrued . . . he commences the action within the periods of time prescribed by this section.

\* \* \* \* \* \*

"(3) The period of limitations is 2 years for actions charging malpractice.:

\* \* \* \* \* \*

"Sec. 5838. A claim based on the malpractice of a person who is, or holds himself out to be, a member of a state licensed profession accrues at the time that person discontinues treating or otherwise serving the plaintiff in a professional or pseudo-professional ca-

pacity as to the matters out of which the claim for malpractice arose."
M.C.L.A. §§ 600.5805, 600.5838.

However, these sections were interpreted by the Michigan Supreme Court in *Dyke v. Richard*, 390 Mich. 739, 213 N.W.2d 185 (1973), wherein the court, after analyzing the legislative comment accompanying the statute and prior Michigan decisional law, stated that the legislature did not intend to preclude the question of discovery. Accordingly it interpreted the statute to require that, as an alternative to the language of section 5838, actions for malpractice must be brought "within two years of the time when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the asserted malpractice, whichever is later." *Id.* at 747, 213 N.W.2d at 188.[5] A review

---

5. Specifically the facts in *Dyke v. Richard* are these:

"'Plaintiffs were involved in an automobile accident near Ann Arbor on August 25, 1965, and received injuries, which were treated at defendant St. Joseph Hospital. The treating physician was defendant Dr. Feller, who treated Ruth Dyke. This action was instituted against defendant Richard for negligence in the operation of his vehicle, and against defendant Dr. Feller for malpractice in failing to properly diagnose the injuries to Ruth Dyke, and against the defendant Hospital on the theory that defendant Feller was its agent and that he, and the X-ray technician employed by the Hospital were negligent in failing to X-ray her pelvic area. She claims this negligence resulted in their failing to find she had suffered a fractured acetabulum as a result of the accident, and that such failure caused her additional damages'" *Id.* at 742–743, 213 N.W.2d at 186.

Reviewing the legislative history of sections 5805 and 5838, the Michigan court determined that the legislature had not intended, in enacting sec. 5838 in 1961, to preclude the rule of discovery which, the court implies, was then in operation.

"Section 5838 which specifies that a claim based on malpractice accrues at the time the claimant is last treated by the licensed professional, comports with the legislative comment accompanying it, *viz*: 'Section 5838 is based on the rule stated and followed in the Michigan case of *De Haan v. Winter*, 258 Mich. 293; 241 N.W. 923 (1932).' If, how-

ever, that was simply the legislative intent it went beyond *De Haan*.

\* \* \* \* \*

Thus there was no rule announced in *De Haan* as to when the cause of action did accrue. The rule announced was that a cause of action *did not* accrue before the treatment stopped. The last sentence quoted above would seem to imply that a cause of action accrues only when the plaintiff is put to inquiry relative to the treatment accorded him.

It is helpful to keep in mind the distinction between a statute which is intended to abrogate a common-law cause of action and a statute of limitation.

A statute which expressly extinguishes a common-law right may be regarded as a proper exercise of legislative authority.

\* \* \* . \* \* \*

But the statute here under consideration was intended to be a statute of limitations. It is a charge on the person who would assert a claim. It requires action on his part within a legislatively specified time, or obliges him to forego it altogether.

\* \* \* \* \* \*

Since '[i]t is of the essence of a law of limitation that it shall afford a reasonable time within which suit may be brought \* \* \*', *Price* [*v. Hopkin*, 13 Mich. 318, 324 (1865)], a statute which extinguishes the right to bring suit cannot be enforced as a law of limitation. As to a person who does not know, or in the exercise of reasonable diligence could not ascertain within the two year period that he has a cause of action,

of the facts underlying *Dyke, supra* (negligent act performed in 1965) and *Cates v. Bald Estate*, 54 Mich.App. 717, 221 N.W.2d 474 (1974) (negligent act performed in 1949) makes it clear the rule enunciated in *Dyke* applies at least as to all malpractice actions commenced after the *Dyke* opinion was rendered notwithstanding the time when the negligent act occurred. Thus, the discovery rule applies to the case at bar.

### Application of the Discovery Rule

 The government claims that the Carons knew well before January 1972 that the inoculations precipitated and caused Monique's convulsions. It cites in support thereof the proximity of the convulsions to the inoculations and the Carons' inquiry of each of the doctors as to whether or not the injections were the proximate cause of her ills; it quotes from *Portis v. United States, supra* at 672, that, "one who knows that an injurious tort has been committed against him may not delay the filing of his suit until the time, however long, when he learns the precise extent of the damage resulting from the tort", and from *Brown v. United States*, 353 F.2d 578, 580 (9th Cir. 1965), that:

"[T]he trial court's determination that, under the facts, the parents were obliged to investigate as to possible negligence must be upheld . . . 'To expect a doctor, voluntarily, absent an inquiry and absent special situations not existent here, to affirmatively advise a patient that he has been

this statute has the effect of abolishing his right to bring suit.
Such a statute, if sustainable at all could be enforced only as one intended to abolish a common law cause of action. But this statute does not purport to do this, is not asserted to do so, and we cannot ascribe any legislative intention to accomplish that end. We read it as a statute of limitation which applies in every case except where the plaintiff does not know of his cause of action.
As indicated above, the 'last treatment' rule as articulated in *De Haan, supra*, was a liberalizing of the general rule that the cause of action accrues at the time of injury. We are

negligently treated is unrealistic and no cases have ever so held.' "

The government also urges, and I do not disagree, that:

"[A] claim cannot be sustained against the United States unless a private physician under the circumstances of this case would be liable under the Michigan law. *United States v. Muniz*, 374 U.S. 150 [83 S.Ct. 1850, 10 L.Ed.2d 805]; *Richards v. United States*, 369 U.S. 1 [82 S.Ct. 585, 7 L.Ed.2d 492]; *Gowdy v. United States*, 412 F.2d 525 (C.A.Mich.1969).

\*　\*　\*　\*　\*　\*

" . . . [F]or a plaintiff to sustain the burden of proof that a physician has been 'guilty' of malpractice, he must prove that the physician did not use the degree of diligence and skill ordinarily exercised by the average physician in the same locality and that an injury resulted from the treatment or non-treatment rendered by the physician [citations omitted]." Defendant's brief at 16.

Finally, the government contends, and the court accepts, that due consideration must be given to the state of the profession at the time that the alleged malpractice took place and that expert medical testimony is a prerequisite to plaintiffs' recovery.

Applying the discovery rule, the court concludes that the government's sole defense of substance, the limitations period, is without merit.

satisfied that the Legislature merely intended to codify the *De Haan* decision and no more intended to obviate the question of discovery than the *De Haan* Court did.
Accordingly we hold that an action based on malpractice by a state licensed person must be brought within two years of the time when such person discontinues treating or otherwise serving the plaintiff, or within two years of the time when the plaintiff discovers, or in the exercise of reasonable diligence should have discovered, the asserted malpractice, whichever is later." *Id.* at 744–746, 213 N.W.2d at 187–188. (emphasis in original).

To begin with, until 1972 the Carons never knew what caused Monique's condition. The record is overwhelming in its facts detailing the constant inquiries they made of all the doctors including the doctors at the Boston Children's Hospital and Dr. Robb, a world renowned specialist. Though the Carons called to the attention of each of these doctors the inoculations given to Monique and the convulsions which followed shortly thereafter, not one of them even suggested as a possibility, let alone probability, a causal connection between the injections and Monique's convulsions. To the contrary, the Army repeatedly told Mrs. Caron her baby would be all right; the doctors at Children's Hospital advised her to consider herself lucky to have a healthy normal baby. All of the doctors simply said they did not know what was causing the convulsions. It was not until 1972 that the Carons were told by Dr. Yazbak that the administration of a combination of DPT and typhoid vaccine was the cause of Monique's affliction. This opinion was subsequently confirmed by Doctors Stoll, Peter and Denhoff, each of whom is an outstanding expert in the field.

I find unpersuasive the defendant's argument that a reasonable person would have concluded there was a causal link between the inoculations and the onset of the convulsions. The government loses sight of the fact that the Carons *were* plagued by this thought and presented it to every doctor they consulted only to have it bypassed by each physician's medical opinion that he did not know the cause. The defendant can hardly contend that it would be reasonable to have expected the Carons to discredit the expert statements of all these learned men of medicine. Furthermore, the Carons cannot be charged with delay in filing this action when it must be noted, as the defendant itself contends, that they could not proceed without expert testimony. Such testimony was simply not available until Dr. Yazbak gave them his opinion in 1972. Under a reasonable man standard, how can we require more of lay people such as the Carons than the medical profession was willing to assume?

The defendant's remaining arguments as to the degree of skill to be possessed by the physician and the state of the profession at the time of the negligent act have no merit. An inquiry into the state of the medical profession in 1963 is simply not warranted under the facts of his case. With all respect, this position is frivolous. Certain facts of this case are ineluctable and no argument can gloss them with even a semblance of doubt. It stands uncontradicted on this record that the Carons were relentless in investigating what actually caused Monique's illness; a physician in Michigan in 1963, 1948 or today would be liable because it was textbook medicine throughout the country, if not internationally, that it was gross negligence to give an infant a .5 milliliter injection of typhoid; such a dosage was "sub-lethal" to a baby; it was basic to the practice of medicine anywhere that a history and complete physical must be performed before such injections are given to a child and then only in proper amounts and only if the area is endemic to typhoid. The negligence is clear as well as the causal connection as testified to by all the doctors. The record stands uncontradicted as to these matters.

I find the government liable.

## DAMAGES

The question of damages has not been adequately briefed by the plaintiffs nor addressed at all by the defendant. Accordingly, the plaintiffs will in two weeks submit a supplemental memorandum fully briefing all pertinent authorities supporting their position as to the method to be used by this court in determining and computing damages to each of them. The defendant will file an answering memorandum one week thereafter. Further, should additional testimony be required on this issue, this court will reopen the case for this purpose either *sua sponte* or at the request of either party.

At the mutual election of the parties this court will either stay entry of judgment on the question of liability until such time as it determines the issue of damages or in the alternative enter judgment for the plaintiffs as to liability and reserve the issue of damages pending completion of appellate review.

## SUPPLEMENTAL OPINION
### (On the issue of damages)

On September 30, 1975, I found the government liable in this negligence action which alleges medical malpractice by Army medical personnel at Custer Air Force Base, Battle Creek, Michigan. The question of damages was reserved pending further briefs and additional testimony, all of which was accomplished on December 19, 1975.

■ Applying the applicable Michigan law, I find that the plaintiff, Monique Caron, is entitled to recover for loss of earning capacity, past and future pain and suffering, past and future medical expenses, and such other damages as resulted directly from the defendant's wrongful act. Remote, contingent, or speculative damages cannot, of course, be considered. *Woodyard v. Barnett,* 335 Mich. 352, 56 N.W.2d 214 (1953); *Brown v. Oestman,* 362 Mich. 614, 107 N.W.2d 837 (1961); *Canning v. Hannaford,* 373 Mich. 41, 127 N.W.2d 851 (1964).

The plaintiffs, Ernest A. and Annette R. Caron, seek an award for those expenses they will incur for the care of Monique at a specialized home to age 18, as well as expenses for medication, neurological treatments, and medical and dental care for the same period of time.

In the case of Monique Caron, an award is sought for care expenses at the specialized nursing home from 18 to 21 years of age, and thereafter to age 50 at a pediatric nursing home; and additionally, those expenses which will be incurred from age 21 to 50 years for medication, neurological care, laboratory, general medical and dental care, loss of earnings from age 18 to 65, and pain and suffering from the date of malpractice to age 50. There is no dispute that Monique Caron would have had a life expectancy to age 65, except for the impairment which reduces it to 50 years.

### Claim of Ernest A. and Annette R. Caron

The government concedes that, if it is liable, then, as to a number of the claims, the damages as alleged by the plaintiffs are correct. In the interest of brevity and clarity, the amounts claimed and the position of the government is set forth in the following chart:

*Claim of Ernest A. and Annette R. Caron as the parents of Monique Caron, to age 18 years (Plaintiffs' memorandum pp. 15–16)*

1. Specialized home care (Crystal Spring School)

 $10,200 per year—commencing April 1976 (13th birthday of Monique Caron)—5 years — — — $51,000

2. Medication for control of seizures—

 $360 per year—5 years — — — $ 1,800

3. Neurological care—

 $200 per year—5 years — — — $ 1,000

4. Medical and dental expenses—

 $400 per year—5 years — — — $ 2,000

5. Psychiatric treatment and counseling at

 $620 per year for 4 years — — — $ 2,480

6. Laboratory and EEG for 5 years at

 $200 per year $ 1,000

 TOTAL $59,280

The government concedes that if it is liable, the plaintiffs are entitled to damages as claimed for all of the foregoing, except that numbered 4.

Accordingly, the Court will engage in discussion of only that item which is in contention. The defendant argues, ". . . the Government does not agree that the claim for medical and dental expenses is proper. These expenses are such that they would be expended in any event. They are not a direct result of the sequelae that was suffered by Monique. They would not be expended because of a natural consequence of the defendants' alleged tortious act." Defendant's Memorandum on Damages, pp. 2–3.

At the hearing held on December 19, 1975, which presented to the Court additional testimony on damages, the government's contention was placed squarely before Dr. Denhoff:

Q. "Doctor, you have stated that general medical care and dental expenses would run approximately $400 per year. Are these expenses that a normal person might incur in the course of a year?"

A. "I intended to explain that these were beyond that anticipated for care of a normal person. The reasons for it are that in the diagnosis and management of a severely handicapped child it often takes two, three or four visits to arrive at an appropriate diagnosis and often several visits to manage such a child in the usual course of events in my experience, so that is beyond that which I would anticipate for a person who is non handicapped mentally and physically." Transcript, December 19, 1975, pp. 3–4.

 The government was offered whatever time it needed to rebut any of the additional testimony offered by the plaintiffs at this hearing. However, it did not elect to do so. On January 5, 1976, it advised this Court that it did not intend to offer any further evidence.[1] Therefore, the testimony of Dr. Denhoff stands uncontradicted and is accepted by me as a full answer to the defendant's objection.

The computed amount of $59,280 must, of course, be reduced to its present value at an appropriate interest rate. This will be discussed, *infra.*

*Claim of Monique Caron*

Again adopting a chart form, these are as follows:

| | | |
|---|---|---|
| 1. | Specialized home care (Crystal Spring School) from age 18–21 years at — — | |
| | $10,200 per year | $ 30,600 |
| 2. | Pediatric Nursing Home from age 21–50 years at — — | |
| | $10,950 per year | $317,550 |
| 3. | Medication from age 18–50 years at — — | |
| | $360 per year | $ 11,520 |
| 4. | Neurological care from age 18–50 years at — — | |
| | $200 per year | $ 6,400 |
| 5. | Laboratory and EEG from age 18–50 years at — — | |
| | $200 per year | $ 6,400 |
| 6. | Medical and dental care from age 18–50 years at — — | |
| | $400 per year | $ 12,800 |
| | TOTAL | $385,270 |

Loss of earnings and pain and suffering are also claimed.

Of the numbered items, the government only contests items 2 and 6 and argues its position as to pain and suffering and loss of earnings. I will, therefore, discuss only these claims which are challenged. Of these, item 6 is accepted as set forth since the government's argument thereto is the same as presented in the parents' claim.

The defendant contends that the claim set forth in item 2 is speculative. It establishes its conclusion on the testimony that the program to which Monique would be subjected (at Crystal Spring School and thereafter) is designed to ultimately educate her in self-care, focused to accomplish her own personal mainte-

---

1. "To: Honorable Raymond J. Pettine
Chief Judge
United States District Court

From: Everett C. Sammartino
Assistant U. S. Attorney

Date: January 5, 1976

Subject: Monique G. Caron, et al. v.
United States of America
Civil Action No. 74–130
(USDC, R. I.)

You are hereby informed that the United States does not intend to offer further testimony or evidence in the Caron case. Also, it is my understanding that you will accept as a final memorandum the memorandum that we have heretofore filed.

s/ E. C. Sammartino "

nance within the facility and ultimately at home; "[t]hus, it is now speculative whether Monique will or will not need institutionalized, custodial care after age 21." Further, the defendant argues that if Monique's seizures are controlled, she can be cared for in a less expensive way by being placed in a state facility which has a state and/or federally funded program.

The possibility of Monique ever attaining self-sufficiency was explained by Dr. Denhoff. He made it quite clear that in his opinion Monique would have to remain, "in protective care in a pediatric nursing home the remainder of her life with the hope she could leave from time to time to return to her family." Transcript p. 5, December 19, 1975, hearing. He pointed out that the benefits to be hoped for from Crystal Springs to age 21 would be to get Monique to a mental age of between six and eight years when she is twenty-one; that for a 21 year old with a mental age between 6–8 years, Rhode Island offers no educational facilities; as Dr. Denhoff put it, "There will be no clear facility, guaranteed facility that would place her into a protective workshop and consequently for her safety I would have to say the probabilities are that she would continue to need protective care because she's now an adult working and needing child-like facilities." Transcript December 19, 1975, p. 6.

█ I need not even reach the legal soundness of the defendant's argument that the plaintiffs' obligation to mitigate damages would require them to accept any less costly equal facility in which the state or federal government participates.[2] No evidence was presented to show this was possible. Even though Dr. Denhoff told the government's attorney that such information might be available from the State Mental Retardation Rehabilitative Services, the defendant did not offer any testimony in that regard. As the record stands, the Court must and does find that there are no state or federally funded facilities offering services that can meet the needs of the plaintiff, Monique Caron.

█ The incontestability of the destruction of Monique's mind with only a potential for optimum recovery to a functional mentality of a 6–8 year old child leaves, in and of itself, little to speculation as to the kind of lifetime care she will need. And, there is the further exacerbating problem of severe convulsions and tantrums. On the present state of medical knowledge, we must conclude uncontrollable seizures will continue and be an ever present medical situation that must be coped with and treated as they occur. Dr. Denhoff stated, in answer to the inquiry whether this youngster would need the care of a pediatric nursing home indefinitely after she is 21 years old, " . . . if her seizures do not burn out, and the likelihood of it, by the current state of the knowledge, is that they will not burn out, the current state of the knowledge is she'll need continued care." Transcript December 19, 1975, p. 7.

Furthermore, Michigan and, indeed, the weight of authority does not demand the certainty urged by the defendant:

"Since, from the nature of the case, the damages cannot be estimated with certainty, and there is a risk of giving by one course of trial less, and by the other more than a fair compensation—to say nothing of justice—does not sound policy require that the risk should be thrown upon the wrongdoer instead of the injured party? However this question may be answered, we can not resist the conclusion that it is better to run a slight risk of giving somewhat more than actual compensation, than to adopt a rule which, under the circumstances of the case, will, in all reasonable probability, preclude the injured party from the recovery of a large proportion of the damages he has actually sustained from the injury,

---

2. The government represented to the Court that it would brief and argue this point. It has not done so.

though the amount thus excluded can not be estimated with accuracy by a fixed and certain rule." *Allison v. Chandler*, 11 Mich. 542, 553, 554 (1863); cited in *Routsaw v. McClain*, 365 Mich. 167, 112 N.W.2d 123 (1961).

In *Gilbert v. Kennedy*, 22 Mich. 117, 130 (1871) we find the court stating,

. "There is no sound reason in such a case, as there may be, to some extent, in actions upon contract, for throwing *any part* of the loss upon the injured party, which the jury believe from the evidence he has sustained, though the precise amount cannot be ascertained by a fixed rule, but must be matter of opinion and probable estimate."

As pointed out in *Routsaw v. McClain, supra*, "*Allison* and *Gilbert* are leading authorities." These cases were cited by the United States Supreme Court in *Story Parchment Company v. Paterson Parchment Paper Company*, 282 U.S. 555, 563, 564; 51 S.Ct. 248, 251, 75 L.Ed. 544, 548 (1931) where the Court said:

"as the Supreme Court of Michigan has forcefully declared, the risk of the uncertainty should be thrown upon the wrongdoer instead of upon the injured party." 51 S.Ct. at 251, 75 L.Ed. at 548.

The cases cited, *supra*, however, still require the application of the teachings in *Brininstool v. Michigan United R. Co.*, 157 Mich. 172, 121 N.W. 728 (1909).

"It is generally an accepted rule that to entitle a plaintiff to recover damages presently for apprehended future consequences of any injury, there must be such a degree of probability of such consequences as to amount to reasonable certainty that they will result from the original injury." *Id.* at 180, 121 N.W. at 731.

The proof in this case presents uncontradicted evidence that Monique will suffer, not only the future disability of a limited mentality, but as well the reasonable certainty of uncontrolled incurable seizures stemming therefrom for the rest of her life; and that such *sequelae* certainly result from the original injury.

Indeed, it is my opinion it would be cavil argument to urge otherwise. Such a record requires the Court to consider the question of future damages as presented by the plaintiffs. *Sarzynski v. Stern*, 13 Mich.App. 158, 163 N.W.2d 641 (1968); *Yates v. Wenk*, 363 Mich. 311, 109 N.W.2d 828 (1961).

I conclude Monique will need pediatric nursing home care as set forth in item 2, *supra*.

## PAIN AND SUFFERING

 I will now consider pain and suffering. The full measure of a tribunal's sound discretion must be employed in assessing a fair amount as damages for the pain and suffering endured and/or to be experienced in the future by the injured party. The amorphous nature of the subject and the infinite variables that come into play make it impossible for the courts to fashion any precise rule. However, the strictures of reasonableness, good sense, nature of the injuries, length of the suffering and the eschewal of sentimentality are guides which assist in determining a fair award. Each case must be viewed in the perspective cast by its unique facts and should not be controlled by judgments rendered in other cases—identical facts in different cases can never exist. No two individuals are alike and no two injuries to separate individuals are ever counterparts of each other. *Griffin v. United States*, 500 F.2d 1059 (3rd Cir. 1974); *Frankel v. Heym*, 466 F.2d 1226 (3rd Cir. 1972); *Wry v. Dial*, 18 Ariz. App. 503, 503 P.2d 979 (1973); 22 Am. Jur.2d *Damages*, Sec. 368, 476.

 The plaintiff, Monique Caron, seeks an award of $1,500,000. for the pain and suffering she has endured from the date of the injury which caused the brain damage and retardation resulting in numerous hospitalizations, brain surgery, and continued seizures, as well as those she will suffer for the rest of her life expectancy to age 50. The government responds by saying, "The injuries suffered by Monique were most certainly catastrophic . . .," but that the

claimed amount for pain and suffering is "outrageous." It bases its conclusions on comparison with other cases—a methodology which this Court rejects.

I need not repeat what this child has endured, the nature of her injuries, and her future suffering. It has all been discussed at length. Before the Court, there is a wasted mind that can never mature beyond the mental age of 6–8 years nor control a body that will grow old and continue to convulse. For the remainder of her life she will never be able to function without supervisory care. She will never be free from the pain and suffering of seizures and the daily frustrations of retardation.

I must exercise my discretion and make an award that comports with fairness. In all candor such an exercise is nothing more than the administration of personalized justice. How can it be otherwise when the end product of existing decisional law confesses that the computation of an award for pain and suffering cannot be impersonalized through the formulation of any inflexible rule? As a consequence, what I do here, in the exercise of what I deem to be "sound discretion," has to be a manifestation of my own economic predilections in repairing a harm caused by another's wrong. However else it may be termed, it is nothing more—it is nothing less.

Applying the guides I have previously articulated in as dispassionate a way as my abilities allow, and keenly sensitive to the responsibility which is mine, I find that $500,000 is a fair award for a lifetime of pain and suffering to be endured by this crippled mind.

## LOSS OF EARNING CAPACITY

■ The final consideration of damages is the future loss of earning capacity, which is an entitlement under Michigan law. *Canning v. Hannaford, supra; Routsaw v. McClain, supra; Prince v. Lott*, 369 Mich. 606, 120 ·N.W.2d 780 (1963). In its brief at page 5, the government admits that Monique " . . may be entitled to recover for expected loss or impairment of earning ability aft-

er she reaches majority", citing *Gumienny v. Hess*, 285 Mich. 411, 280 N.W. 809; *Vink v. House*, 336 Mich. 292, 57 N.W.2d 887, and submits that if a table is to be used, as placed in evidence by the plaintiffs' economist, it should be Table 6. *See* exhibit number 1.

The threshold questions to be answered are whether or not inflation is to be included in any determination of this final issue and whether or not taxes should be excluded.

The latest pronouncement from the Michigan courts on inflation is the intermediate appellate case of *Freeman v. Lanning Corporation*, 61 Mich.App. 527, 233 N.W.2d 68 (1975). This opinion has not been appealed and stands as the controlling law in the State of Michigan. The court stated, 233 N.W.2d at 69:

"Courts have divided on whether an award of damages for losses suffered in the future may take account of inflationary trends in the economy. No Michigan cases have directly addressed this question. A large number of other jurisdictions have refused to allow consideration of rising costs in fixing prospective damages. *Frankel v. Heym*, 466 F.2d 1226 (CA 3, 1972), affirming *Frankel v. United States*, 321 F.Supp. 1331 (E.D.Pa., 1970); *Petition of United Steel Corp.*, 436 F.2d 1256 (CA 6, 1970); *Williams v. United States*, 435 F.2d 804 (CA 1, 1970); *Armentrout v. Virginian R. Co.*, 72 F.Supp. 997 (S.D.W.Va.1947), rev'd on other grounds, 166 F.2d 400 (CA 4, 1948); *Raines v. New York Central R. Co.*, 129 Ill.App.2d 294, 263 N.E.2d 895 (1970); *Zarsinovich v. American Airlines, Inc.*, 26 A.D.2d 155, 271 N.Y.S.2d 866 (1966). The principal argument advanced against considering the effects of economic trends on damage recoveries is that such trends are inherently unpredictable. In addition, it is said, a plaintiff may place his award in investments which gain a higher return than the statutory interest rate, and the adverse effects of inflation will thus be reduced.

Plaintiff contends, upon authority of *Normand v. Thomas Theatre Corp.*, supra, 349 Mich. 50, 61–62, 84 N.W.2d 451, 456 (Mich.1957), that the trial court was entitled to take judicial notice of the effects of inflation in fixing damages and that the court took account of such effects. *Normand* and cases like it stand only for the principle that courts need not be bound by the size of past awards in determining whether a current award is excessive. Rather they may take note of rising prices due to past inflation in order to justify large verdicts against a charge of excessiveness. See *Williams v. United States, supra.*

The trial court erred in not reducing the plaintiff's recovery to present value."

The court remanded the case for re-computation in accordance with Michigan Standard Jury Instructions S.J.I. 34.03, which calls for a six percent interest rate in reducing the award to present value. The government agrees this is so.

It is interesting to note that the *Freeman* holding is no different than the existing law in this Circuit.

"Nor, finally, can we accept plaintiff's argument that the anticipated future earnings are to be increased by some multiple taken out of the air in the name of future inflation. While plaintiff submitted a number of cases making reference to inflation, most of them are simply rejections of comparisons with past verdicts, on the ground that subsequent, already demonstrated, inflation has made the comparison inapposite. None clearly accept the use of predictions as to future inflation. While we have found a case which may be read as speaking in terms of future inflation, *Southern Pac. Co. v. Zehnle*, 9 Cir., 1947, 163 F.2d 453, and one which must be so regarded, *Brooks v. United States*, D.S.C., 1967, 273 F.Supp. 619, both rely exclusively on cases involving inflation already established. Particularly in considering predictions of an accumulated estate, which, if there is infla-

tion, must be adjusted for possibly inflated expenses as well as earnings, we consider such speculation inadmissible. *Armentrout v. Virginia Ry.*, S.D.W. Va., 1947, 72 F.Supp. 997, rev'd on other grounds, 4 Cir., 166 F.2d 400; *Hodkinson v. Parker*, 1944, 70 S.D. 272, 16 N.W.2d 924; *cf. McWeeney v. New York, N.H. & H. R.R.*, 2 Cir. 1960, 282 F.2d 34, 38 (dictum), *cert. denied* 364 U.S. 870, 81 S.Ct. 115, 5 L.Ed.2d 93." *Williams v. United States, supra*, at p. 807.

■ I conclude that there can be no adjustment to accommodate inflationary trends.

■ Turning next to income tax consequences, it appears quite clearly that Michigan holds they should not be taken into consideration in making a personal injury award. I take guidance from *Grant v. National Acme Company*, 351 F.Supp. 972 (W.D.Mich.1972). This was a diversity case applying Michigan law. The court stated:

"Defendant also specifically objects to the courts refusal to instruct the jury as to the tax consequences of any damage award. The law is clear that such an instruction is within the trial court's discretion. Indeed, the majority view apparently favors withholding all reference to income tax consequences. *Prudential Insurance Co. of America v. Wilkerson*, 327 F.2d 997 (5th Cir. 1964); *Nice v. C&O R.R.*, 305 F.Supp. 1167 (W.D.Mich.1969); *McWeeney v. N.Y.N.H. & H. R. R.*, 282 F.2d 34 (2nd Cir. 1960). See A.L.R.2d 1393, § 4(a)." *Id.* at 979.

I conclude that income tax consequences should not be taken into consideration.

## COMPUTATION OF DAMAGES

Dr. John Kennan, an economics expert, testified on behalf of the plaintiffs. As stated, *supra*, the government does not take issue with his computations; that is, it does not challenge the procedures he used nor his final arithmatic results. It questions whether tables should be

used at all but if they are used then only certain ones of those offered by Dr. Kennan are proper.

The doctor offered various approaches based on United States statistical data, of which, I will only discuss those urged respectively by the plaintiffs and the defendant. The plaintiffs say that an award for loss of earnings should be based on the present value of the prospective earnings of an average worker, rather than, as defendant contends, female wages, in the United States before taxes. They premise their position on, "existing Federal and State legislation and the present trend toward equality in employment." The government adds to its contention that not only should female wages be used but additionally an accounting should be made for normal and average periods of unemployment due to economic conditions. Dr. Kennan has exempted a ten-year furlough period from his computations to account for the average female's child-bearing years.

 I am constrained to agree with the defense that the present value of prospective earnings, female wages, before taxes must be used. However sympathetic this Court may be to equality in employment, it must look to the reality of the situation and not be controlled by its own convictions. One does not need expert testimony to conclude that there is inequality in the average earnings of the sexes. There is no criterion to help us predict when this unwarranted condition will be remedied and as a consequence I feel compelled to adopt the defendant's position; but I do not believe that more than ten years should be ex-empted in arriving at a figure. Of course, there is, in all this, an element of conjecture. In all probability there will be periods of unemployment, so too, it can be said that Monique might not have had a ten-year child bearing furlough. I feel a ten-year period to encompass both contingencies is eminently fair.

The defendant inserts in its brief, the following language from D'Ambra v. United States, 481 F.2d 14 (1st Cir. 1973), as support for the non-utilization of tables at all:

> "Compensatory damages in terms of monetary loss are computable with a reasonable degree of accuracy in the case of an individual who has lived long enough to present a pattern of earnings, * * * or at least long enough to show characteristics from which his earnings may be anticipated * * * A small child, however, presents a special problem—absent some extraordinary demonstrations there is nothing individual to go on. * * *" Id. at 18.

To me this seems rather contradictory to its previous stand and an unpersuasive argument to convince this Court that it should rely on other judicial decisional awards as a guide. To engage in such an exercise is a "dangerous game" and can only lead to imperfect analogies. See 22 Am.Jur.2d Damages, § 368. Furthermore, the D'Ambra citation is inapposite to the case at bar. Here we are dealing with compensatory damages to a living person and not with the federal government's liability in a wrongful death action.[3]

---

3. The plaintiffs succinctly argued this point in their brief at 36:

"E—SIGNIFICANCE OF D'AMBRA

The defendant in its memorandum attempts to use language from D'Ambra v. United States of America on the issue of loss of earning capacity. In D'Ambra the Circuit Court of Appeals in considering the Rhode Island Wrongful Death Statute stated at 481 F.2d page 16:

Our question, prompted by its history and consideration of the Act as a whole, is whether Congress intended in a wrongful death case to accept liability over and above compensating the survivors to the extent of their loss; viz., if a state statute so provided, to pay an additional sum computed on some concept of the ultimate value of the estate, which, demonstrably, the survivors would never have received. (emphasis added)

In the instant case of Monique Caron we are dealing strictly with compensatory damages for injuries to a living person. Computing damages to a living person includes loss of future earning capacity and is not an element of damages created by statute.

 Applying the foregoing, and utilizing Dr. Kennan's figures, I award the following damages:

A. To the plaintiffs, *Ernest A. and Annette R. Caron* ($59,280. reduced to present value at 6% without inflation) the sum of ——— $ 49,549

(*See* table at page 392, *supra*, and Dr. Kennan's revised tables, n. 5, *infra*.

B. To the plaintiff *Monique Caron*—

a) ($385,270 reduced to present value at 6% without inflation) the sum of ——— $126,075

b) Loss of earnings from age 18 to age 65 with a ten-year furlough, before taxes and without inflation —female wages [4] ——— $ 30,251

(*See* Dr. Kennan's revised tables)

c) Pain and suffering ——— $500,000

Total damages to *Monique Caron* [5] ——— $656,326.00

An order will be prepared accordingly.

There is no Michigan statute involved which might be construed as 'punitive' under the Federal Tort Claims Act as was reasoned in *D'Ambra.* The elements of damages proven in the instant case including loss of earning capacity are elements of damages considered in personal injury cases in Michigan and universally considered in personal injury cases in all states throughout the United States.

The Federal Tort Claims Act itself, 28 U.S.C. § 1346(b) provides:

Subject to the provisions of chapter 171 of this title . . . the district courts . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages, accruing on and after January 1, 1945, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, *under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.* (emphasis added)"

4. The period of 18 to 65 years is used because Monique's injury has shortened her expected life span to 50 years, thus depriving her of the 15 remaining productive years.

5. Dr. Kennan submitted to counsel for the plaintiffs revised Tables using a 6% reduction to present values without inflation. These have been stipulated as part of the record.